**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SCOTTS VALLEY BAND OF POMO
INDIANS,

               Plaintiff,

v.

DOUGLAS BURGUM, in his official capacity
as Secretary of the U.S. Department of the
Interior,

SCOTT DAVIS, in his official capacity as
Senior Advisor to the Secretary of the U.S.
Department of the Interior,

and

UNITED STATES DEPARTMENT OF
THE INTERIOR,

               Defendants.

Civil Action No.: 1:25-cv-00958

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A**

**TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................9

LEGAL STANDARD..........................................................................10

BACKGROUND ................................................................................10

ARGUMENT ......................................................................................14

I.   SVBPI IS LIKELY TO SUCCEED ON THE MERITS OF ITS
     CLAIMS ..................................................................................14

     A.  The March 27 Rescission Constitutes Final Agency Action and Is
         Reviewable ......................................................................14

     B.  The Rescission Violates SVBPI's Protected Due Process Rights .17

     C.  The Senior Advisor to the Secretary of Interior Lacked Authority
         to Issue the Decision to Rescind the Eligibility Determination .....22

     D.  The Secretary lacks authority under either general administrative
         law principles or 43 C.F.R. § 4.5 to rescind the gaming eligibility
         determination ...................................................................24

         1.  The Secretary's general authority to review final agency action
             is limited......................................................................24

             a.  The decision is not complex ............................................26

             b.  The March 27 Rescission immediately upsets legally
                 cognizable property interests ............................................27

             c.  SVBPI's reliance on the January 10, 2025, final decision
                 weighs against reconsideration .........................................27

             d.  The Department's claimed basis for reconsideration is
                 clearly a pretext.................................................................29

             e.  The Probable Impact of an Erroneous Agency Decision
                 Absent Reconsideration is Minimal...................................32

         2.  Section 4.5 does not support the Secretary's decision to rescind
             the January 10, 2025, final agency action ...............................34

E. The March 27 Rescission Threatens the Trust Acquisition Purpose and Intrudes on NIGC's Authority ...............................................37

II. SVBPI FACES IMMINENT AND IRREPARABLE HARM WITHOUT COURT INTERVENTION...............................................39

III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF...............................................................40

IV. NO BOND SHOULD BE REQUIRED...............................................42

CONCLUSION...............................................................................43

# TABLE OF AUTHORITIES

*Page(s)*

## *Cases*

*Am. Greyhound Racing, Inc. v. Hull*,
  305 F.3d 1015 (9th Cir. 2002) ............................................. 21

*Bangor Hydro-Electric Co. v. F.E.R.C.*,
  78 F.3d 659 (D.C. Cir. 1996) ............................................. 34

*Belville Mining Co. v. United States*,
  999 F.2d 989 (6th Cir. 1993) ............................................. 25, 26, 28

*Bennett v. Spear*,
  520 U.S. 154, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997) ....................................... 15

*Bishop Paiute Tribe v. Inyo County*,
  863 F.3d 1144 (9th Cir. 2017) ............................................. 20

*Bookman v. United States*,
  197 Ct.Cl. 108, 453 F.2d 1263 (1972) ............................................. 25

*Clean Air Council v. Pruitt*,
  862 F.3d 1 (D.C. Cir. 2017) ............................................. 15

*Confederated Tribes & Bands of the Yakama Nation v. Yakima Cnty.*,
  963 F.3d 982 (9th Cir. 2020) ............................................. 21

*Coteau Properties Co. v. Dep't of Interior*,
  53 F.3d 1466 (8th Cir. 1995) ............................................. 30, 31

*Crawford v. FCC*,
  417 F.3d 1289 (D.C. Cir. 2005) ............................................. 22

*Dun & Bradstreet Corp. Found. v. United States Postal Serv.*,
  946 F.2d 189 (2nd Cir. 1991) ............................................. 25, 37

*Edmond v. United States*,
  520 U.S. 651 (1997) ............................................. 24

*Essar Steel Ltd. v. United States*,
  678 F.3d 1268 (Fed Cir. 2012) ............................................. 12

*Florida Institute of Technology v. FCC*,
     952 F.2d 549 (D.C. Cir. 1992) ............................................................................. 22

*Gratehouse v. United States*,
     206 Ct.Cl. 288, 512 F.2d 1104 (1975) ................................................................. 25

*Greene v. Babbitt*,
     64 F.3d 1266 (9th Cir. 1995) .............................................................................. 18

*Hall v. Johnson*,
     599 F. Supp. 2d 1 ................................................................................................ 10

*Ivy Sports Med., LLC v. Burwell*,
     767 F.3d 81 (D.C. Cir. 2014) .............................................................................. 25

*Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*,
     172 F.3d 397 (6th Cir. 1999) .............................................................................. 18

*League of Women Voters of United States v. Newby*,
     838 F.3d 1 (D.C. Cir. 2016) ............................................................................... 10

*Lynch v. United States*,
     292 U.S. 571 (1934) ........................................................................................... 20

*Mashantucket Pequot Tribe v. Town of Ledyard*,
     722 F.3d 457 (2d Cir. 2013) ............................................................................... 20

*Mashpee Wampanoag Tribe v. Bernhardt*,
     No. CV 18-2242 (PLF), 2020 WL 3034854 (D.D.C. June 5, 2020) ........................... 16, 40, 41

*Mathews v. Eldridge*,
     424 U.S. 319, (1976) .......................................................................................... 18

*Mazaleski v. Truesdell*,
     562 F.2d 701 (D.C. Cir. 1977) ............................................................................ 25

*Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*,
     226 F.3d 1226 (11th Cir.2000) ........................................................................... 20

*Mille Lacs Band of Ojibwe v. Cnty. of Mille Lacs, Minnesota*,
     508 F. Supp. 3d 486 (D. Minn. 2020) ................................................................. 20

*Panhandle Eastern Pipe Line Co. v. FERC*,
     613 F.2d 1120 (D.C. Cir. 1979) .......................................................................... 22

*Phillips v. Wash. Legal Found.*,
   524 U.S. 156 (1998) ................................................................................................ 19

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
   758 F.3d 296 (D.C. Cir. 2014) ................................................................................ 19

*Ramah Navajo Sch. Bd. v. Bureau of Revenue of N.M.*,
   458 U.S. 832, (1982) ............................................................................................... 20

*Reeve Aleutian Airways, Inc. v. United States*,
   982 F.2d 594 (D.C.Cir.1993) .................................................................................. 18

*Rosebud Sioux Tribe v. Gover*,
   104 F. Supp. 2d 1194 (D.S.D. 2000) ...................................................................... 28

*Salazar v. King*,
   822 F.3d 61 (2d Cir. 2016) ...................................................................................... 15

*Scotts Valley Band of Pomo Indians of Sugar Bowl Rancheria v. United States*,
   921 F.2d 924 (9th Cir. 1990) ............................................................................ 11, 17

*Scotts Valley Band of Pomo Indians v. United States Dep't of the Interior*,
   633 F. Supp. 3d 132 (D.D.C. 2022) .............................................................. 11, 12, 30

*State of La. v. Dep't of Energy*,
   507 F. Supp. 1365 (W.D. La. 1981) ........................................................................ 15

*Tesoro High Plains Pipeline Company LLC, v. United States*,
   2024 WL 3359433 (D.N.D. 2024) ..................................................................... 25, 31

*Texas v. EPA*,
   726 F.3d 180 (D.C. Cir. 2013) ................................................................................ 22

*Texas v. United States*,
   524 F.Supp.3d 598 (S.D. Tex. Feb. 23, 2021) ....................................................... 16

*Transmission Access Policy Study Group v. F.E.R.C.*,
   225 F.3d 667 (D.C. Cir. 2000) ................................................................................ 33

*Tribes of the Warm Springs Res. of Oregon v. United States*,
   177 Ct.Cl. 184, 1966 WL 8893 (1966) ................................................................... 28

*U.S. v. Prieto*,
   655 F. Supp. 1187 (D.D.C. 1987) ........................................................................... 28

6

*United States v. Sioux Nation of Indians,*
    448 U.S. 371 (1980) ................................................................................ 18

*Ute Indian Tribe of Uintah & Ouray Reservation v. Utah,*
    790 F.3d 1000 (10th Cir. 2015) ....................................................... 16, 40

*Voyageur Outward Bound School v. United States,*
    444 F.Supp.3d 182 (D.D.C. 2020) ................................................... 25, 26

*White Mountain Apache Tribe v. Bracker,*
    448 U.S. 136 (1980) ................................................................................ 20

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) .................................................................................... 10

## <u>*Statutes*</u>

18 U.S.C. § 1166 .......................................................................... 13, 16, 21

25 U.S.C. § 2701 ........................................................................... 13, 16, 21

25 U.S.C. § 2702(1) ............................................................................... 19

25 U.S.C. § 2710 .................................................................................... 39

25 U.S.C. § 2710(d)(3)(A) ..................................................................... 21

25 U.S.C. § 2719 .................................................................................... 29

25 U.S.C. § 2719(b)(1)(B)(iii) ........................................................ 14, 19

U.S. Const. art. II, § 2, cl. 2 .................................................................. 23

## <u>*Rules*</u>

Federal Rule of Civil Procedure 65 .......................................................... 9

## <u>*Regulations*</u>

25 C.F.R. Part 292.......................................................................... passim

25 C.F.R. § 151.9 ................................................................................... 12

25 C.F.R. § 292.12 ................................................................................. 12

43 C.F.R. § 4.5 ............................................................................... passim

43 C.F.R.§ 4.5(a)(2) ........................................................................................................................ 24

### *Other Authorities*

Pub. L. No. 85–671 .......................................................................................................................... 11

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1, Plaintiff Scotts Valley Band of Pomo Indians ("SVBPI") respectfully moves for a Temporary Restraining Order ("TRO") enjoining Defendants from taking any action to reopen the administrative record or consider extra-record evidence in connection with the Department of the Interior's January 10, 2025, Gaming Eligibility Determination ("Eligibility Determination").

## **INTRODUCTION**

This case involves an extraordinary and unlawful action by the United States Department of the Interior (the "Department") that threatens to upend nearly a decade of legal process and administrative review. On January 10, 2025, following years of agency review, litigation, and a court-ordered remand, the Department issued a final decision affirming that the Scotts Valley Band of Pomo Indians is eligible to conduct gaming on its trust land under IGRA. That Eligibility Determination was based on a closed administrative record and reflected the culmination of multiple rounds of detailed agency review.

Yet, without any formal notice, opportunity to be heard, or legal authority to do so, the Senior Advisor to the Secretary of the Interior, purportedly "Exercising by delegation the authority of the Assistant Secretary - Indian Affairs," issued a letter purporting to "temporarily rescind" that final determination on March 27, 2025 (the "March 27 Rescission"). The March 27 Rescission immediately subjects gaming on the trust property (the "Vallejo Site") from the laws of SVBPI to the laws of the State of California. The Recission states, "The Secretary is concerned that the Department did not consider additional evidence submitted after the 2022 Remand," and re-opens the administrative record months after the Department's final Eligibility Determination was

issued.` The Recission invites and relies upon submissions made outside the closed administrative record— including extra-record materials submitted by third parties that were found to have no standing or participation rights in the prior proceeding—and threatens to reopen the process without any safeguards of due process or established procedure.

Defendants' conduct is not only procedurally indefensible, but it also violates foundational principles of administrative and constitutional law. This Court's intervention is urgently needed to prevent irreparable harm to SVBPI's sovereign and economic interests and to preserve the rule of law pending resolution of this case.

## **LEGAL STANDARD**

The Court should grant SVBPI's request for a temporary restraining order directing the individual Defendants to immediately cease opening the administrative record and considering extra-record submissions, because all four factors weigh in SVBPI's favor. A temporary restraining order may be granted where the plaintiff demonstrates: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm, absent injunctive relief, (3) the balance of hardships tips in their favor, and (4) the injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016); *Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n. 2 (D.D.C. 2009) ("The same standard applies to both temporary restraining orders and to preliminary injunctions."). Here, all four factors demonstrate SVBPI's entitlement to a temporary restraining order.

## **BACKGROUND**

The documented history of the Scotts Valley Band of Pomo Indians stretches back to at least the 1800s. *Scotts Valley Band of Pomo Indians v. United States Dep't of the Interior*, 633 F.

Supp. 3d 132, 138 (D.D.C. 2022).  SVBPI is the modern-day successor of the Mo-al-kai (also

known as "Moalkai," "Yimaba," and "Yimabak") and Ca-la-na-po (also known as the "Kulanapo"

and "Hoolanapo") bands of Pomo Indians. *Id*. Each of these bands was a signatory to the August

20, 1851, Treaty of Camp Lu-pi-yu-ma with the United States, in which the tribes agreed to cede

aboriginal lands in exchange for the establishment of a reservation by the United States. *Id*. The

Senate never ratified that treaty, though, and no land was otherwise reserved for the tribe. *Id*.

      In 1911, the United States acquired a parcel of land for SVBPI known as the Sugar Bowl

Rancheria. SVBPI continued to hold that land until 1958, when Congress enacted the California

Rancheria Termination Act, Pub. L. No. 85–671, 72 Stat. 619 (1958), which terminated both the

federal trust relationship with the tribe as well as the reservation status of the Sugar Bowl

Rancheria. *Id*. In 1986, SVBPI and other California Indian tribes filed a class action lawsuit against

the United States, alleging that the Government had unlawfully terminated their trust status twenty-

eight years before. *Scotts Valley Band of Pomo Indians of Sugar Bowl Rancheria v. United States*,

921 F.2d 924 (9th Cir. 1990). As part of the settlement of that litigation, the United States reinstated

SVBPI's status as a federally recognized tribe, which became effective on September 5, 1991. *See*

Notice of Reinstatement to Former Status for the Guidiville Band of Pomo Indians, the Scotts

Valley Band of Pomo Indians and Lytton Indian Community of CA, 57 Fed. Reg. 5214 (Feb. 12,

1992) ("Notice of Reinstatement"). But that act was not accompanied by the identification of any

land for the tribe. *See* Notice of Reinstatement.

      In August 2016, Scotts Valley submitted a request to Interior to acquire lands in trust for

gaming. *Scotts Valley Band of Pomo Indians,* 633 F. Supp. 3d at 139.  It requested, pursuant to 25

C.F.R. § 151.9, that the Department acquire certain land in the City of Vallejo, California, referred

to as the Vallejo Site, into trust on its behalf. *Id*. In connection with that effort, on January 28, 2016, SVBPI submitted a request for an Indian Lands Opinion, or "restored lands" determination, pursuant to 25 C.F.R. Part 292. *Id*. On February 7, 2019, the Department denied the Tribe's request to take the Vallejo Site in trust for gaming purposes, finding that the Parcel did "not meet the regulatory requirements necessary to qualify for the restored lands exception under IGRA." *Id*. The decision was based on a determination that "the [SVBPI] Band ... failed to provide sufficient evidence of a 'significant historical connection' to the [Vallejo Site], as required to qualify this particular property for the restored lands exception" pursuant to 25 C.F.R. § 292.12. *Id*.

SVBPI challenged that denial in federal court. On September 30, 2022, the United States District Court for the District of Columbia ruled that the Department's denial was arbitrary and capricious when considered in light of the Indian canon of statutory construction, and remanded the matter for further consideration. *Scotts Valley Band of Pomo Indians v. United States Dept of the Interior*, 633 F. Supp. 3d 132 (D.D.C. 2022).

On remand, the Department reconsidered its prior decision based upon the existing administrative record, taking into account the Court's decision. Decl. of Tribal Chairman Shawn Davis, April 1, 2025, ¶¶ 7-8. The Department initially inquired whether the Tribe wished to supplement the record, but the Tribe declined. Accordingly, the Department determined that reopening the Administrative Record was unnecessary. Davis Decl. ¶ 8. The Department subsequently issued its January 10, 2025, final decision acquiring the Vallejo Site in trust, and issuing a Gaming Eligibility Determination (the "Eligibility Determination") pursuant to 25 C.F.R. Part 292, concluding that the Tribe met the regulatory criteria for gaming on restored lands. See, Exhibit A. In accordance with the decision, on January 10, 2025, title to the Vallejo Property was

transferred to the United States in trust for the benefit of SVBPI.  As a final agency action, the trust transfer and Eligibility Determination transferred the applicable substantive law over gaming activity on the Vallejo Site from the laws of State of California to SVBPI.  *See* 18 U.S.C. § 1166 (applying "all State laws pertaining to the licensing, regulation, or prohibition of gambling" to Indian Country, unless such gambling is conducted pursuant to the IGRA, 25 U.S.C. § 2701, et seq.).

Following the Department's acquisition of the Vallejo Site in trust, SVBPI committed substantial resources in reliance on the January 10 Eligibility Determination, including negotiating and entering into contracts, signing a reimbursement agreement with the City of Vallejo, and authorizing the expense of millions of dollars, and initiating regulatory planning over the trust land, including the approval of gaming ordinance by the National Indian Gaming Commission. Complt. ¶ 22-23 ECF No. 1; Davis Decl. ¶¶ 12-16. On March 27, 2025, Defendant Davis issued the March 27 Recission unilaterally and without notice or consultation with the Tribe, purporting to "temporarily rescind" the final Eligibility Determination.  The Rescission states, in relevant part:

> This letter is to inform you that, while the Trust Determination still stands and the Vallejo Site remains in trust, the Department is temporarily rescinding the Gaming Eligibility Determination for reconsideration. This action is taken pursuant to 43 C.F.R. § 4.5, which provides the Secretary of the Interior (Secretary) with broad authority to review and reconsider any decision of the Department. The Secretary is concerned that the Department did not consider additional evidence submitted after the 2022 Remand. During the pendency of this reconsideration, neither the Tribe nor any other entity or person should rely on the Gaming Eligibility Determination.

> To aid in our reconsideration, we invite the Tribe and other interested parties to submit evidence and/or legal analysis regarding whether the Vallejo Site qualifies as restored lands under 25 U.S.C. § 2719(b)(l)(B)(iii) and 25 C.F.R. Part 292. To ensure that we have all the relevant materials, any documents submitted to the

Department after the 2022 Remand should be resubmitted. . . . The deadline for submissions is Friday, May 30, 2025.

Complt., Ex. B. The March 27 Rescission is signed by Defendant Davis as, "Senior Advisor to the Secretary of the Interior Exercising by delegation the authority of the Assistant Secretary - Indian Affairs."

On March 31, 2025, the Tribe, through its counsel submitted a formal request to the Office of the Assistant Secretary – Indian Affairs for government-to-government consultation concerning the March 27 Rescission. Decl. of Arlinda J. Locklear, April 1, 2025, ¶¶ 2-3. On the same day, Ms. Locklear also contacted the scheduler for the Assistant Secretary's office by telephone to emphasize the urgency of the Tribe's request. Locklear Decl. ¶ 5. As of the time of this filing, Defendants have not acknowledged the Tribe's request, have not responded in any manner, and have not scheduled or offered any consultation with the Tribe. Locklear Decl. ¶ 6.

## ARGUMENT

### I.    SVBPI IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.

#### A.  The March 27 Rescission Constitutes Final Agency Action and Is Reviewable.

SVBPI has demonstrated a strong likelihood of success on its APA and due process claims. The Department has no authority to unilaterally reopen the administrative record or rescind a final agency decision outside of established procedures. Complt. ¶ 30, ECF No. 1. Its reliance on 43 C.F.R. § 4.5 is misplaced, and its March 27 Rescission is not a proper basis for withdrawing a final decision. The Department's actions are arbitrary, capricious, and contrary to law.

As a general matter, two conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decision-making process, it must not be

of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow. *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S. Ct. 1154, 1168, 137 L. Ed. 2d 281 (1997) (internal quotations and citations omitted). Here, the Secretary's decision to "temporarily suspend" the Department's prior final Eligibility Determination constitutes final agency action. "The label an agency attaches to its action is not dispositive" of whether the action is final. *State of La. v. Dep't of Energy*, 507 F. Supp. 1365, 1371 (W.D. La. 1981), aff'd sub nom. *Dep't of Energy v. State of Louisiana*, 690 F.2d 180 (Temp. Emer. Ct. App. 1982). Contrary to what is stated in the March 27 Recission, it is not "temporary." To say that the decision is "temporary" implies that the Eligibility Determination will be restored at some point. But here, the March 27 Recission is effective immediately, there is no deadline for Defendants to complete their reconsideration, and thus the Recission is indefinite. More importantly, there is no guarantee that the Eligibility Determination will be restored, and, as discussed below, there is every reason to believe that the intent of the Recission is to ultimately rescind it. An agency's decision to temporarily "suspend" or "pause" a prior final agency action constitutes final agency action subject to judicial review. *See, e.g., Salazar v. King*, 822 F.3d 61, 83 (2d Cir. 2016)( "The decision to suspend or not to suspend is a final agency action because the action had an immediate and substantial impact upon the complaining party.") *Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017), (decision to suspend the implementation of a final rule constituted final agency action); *Texas v. United States*, 524 F.Supp.3d 598 (S.D. Tex. Feb. 23, 2021), (a 100 day pause of prior deportation decision constituted final agency action).

There is no question that the Defendants' action of suspending the prior final January 10 Eligibility Determination has immediate and substantial legal and practical consequences for SVBPI.  As noted herein, SVBPI is already incurring serious harm. It has committed substantial resources in reliance on the Department's final Eligibility Determination, including negotiating and entering into contracts, including signing a reimbursement agreement with the City of Vallejo, borrowing millions of dollars under a pre-development loan, and initiating regulatory planning over the trust land. Complt. ¶ 22-23, ECF No. 1; Davis Decl. ¶¶ 12-16. The Secretary's action also deprives SVBPI of its sovereign right to apply the substantive gaming laws of SVBPI to activities on its trust lands during the period of time that the Eligibility Determination is suspended, because it immediately (and without notice) changes the applicable substantive gaming laws on the Vallejo Site from the laws of SVBPI to the laws of the State of California. See 18 U.S.C. § 1166 (applying "all State laws pertaining to the licensing, regulation, or prohibition of gambling" to Indian Country, unless such gambling is conducted pursuant to IGRA 25 U.S.C. § 2701, et seq.).   As such, the Secretary's action substantially infringes on SVBPI's sovereign authority over the Vallejo Site and inflicts irreparable harm to SVBPI. *Mashpee Wampanoag Tribe v. Bernhardt*, No. CV 18-2242 (PLF), 2020 WL 3034854, at *3 (D.D.C. June 5, 2020) (recognizing that even a partial infringement on a tribe's sovereignty over its land constitutes irreparable harm) (*citing Ute Indian Tribe of Uintah & Ouray Reservation v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015)).  Moreover, as discussed below, the March 27 Recission immediately deprives SVBPI of a valuable property right – the right to conduct gaming on the Vallejo Site. While the Defendants established May 30, 2025, as the deadline for any interested party to submit any additional evidence or legal analysis regarding whether the Vallejo Site qualifies as restored lands, there is no deadline or prescribed timeline for

16

the Department to complete its reconsideration or issue a new final decision. Thus, the Secretary's indefinite rescission casts legal uncertainty over SVBPI's project, jeopardizes relationships with partners and contractors, and undermines SVBPI's sovereignty and economic development efforts.

Moreover, the Secretary's action effectively grants judgment in favor of plaintiffs on contested issues in two cases pending before this court. *See*, Complaint, *Yocha Dehe Wintun Nation v. U.S. Dep't of the Interior*, No. 1:25-cv-00867 (D.D.C. filed Mar. 24, 2025) and Complaint, *United Auburn Indian Cmty. of the Auburn Rancheria v. U.S. Dep't of the Interior*, No. 1:25-cv-00873 (D.D.C. filed Mar. 24, 2025). In those cases, plaintiffs seek to vacate the Eligibility Determination on the grounds that the Department, in issuing the Eligibility Determination, failed to consider materials submitted after the administrative record closed in 2019. *See* Complaint, *Yocha Dehe Wintun Nation v. U.S. Dep't of the Interior*, at 41-42; Complaint, *United Auburn Indian Cmty. of the Auburn Rancheria v. U.S. Dep't of the Interior*, at 23-23, 28. Plaintiffs in those cases seek a remand to the Department to consider evidence outside of the administrative record. Complaint, *United Auburn Indian Cmty. of the Auburn Rancheria v. U.S. Dep't of the Interior*, at 35. By suspending the Eligibility Determination and re-opening the administrative record for materials to be submitted by plaintiffs in those cases, Defendants are effectively granting plaintiffs the relief they seek, in part, to the detriment of SVBPI, without providing SVBPI with notice or an opportunity to be heard.

**B. The Recission Violates SVBPI's Protected Due Process Rights.**

The March 27 Rescission violates SVBPI's rights under the Due Process Clause of the Fifth Amendment to the United States Constitution, which provides that *"[n]o person shall be... deprived of life, liberty, or property, without due process of law." See*, U.S. Const. amend. V. The

U.S. Supreme Court has long recognized that Indian tribes can assert constitutional rights against the federal government, including under the Fifth Amendment. In *United States v. Sioux Nation of Indians*, 448 U.S. 371 (1980), the Court held that the federal government's taking of tribal property without just compensation violated the Fifth Amendment's Takings Clause. This recognition of the Tribe as a "person" for purposes of property protections equally extends to due process claims, particularly when the federal government takes action that directly interferes with the Tribe's vested interests. *See also*, *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Bd.*, 172 F.3d 397, 403 (6th Cir. 1999) (Indian tribe had standing to bring claims for violation of Tribe's Equal Protection and First Amendment rights under the U.S. Constitution).

Due process requires notice and an "opportunity to be heard at a 'meaningful time and in a meaningful manner" prior to the deprivation of a property or liberty interest. *Mathews v. Eldridge*, 424 U.S. 319, 339–43, (1976); *Accord*, *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 599 (D.C.Cir.1993) ("[d]ue process requires 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.")(internal quotations and citations omitted); *See also*, *Greene v. Babbitt*, 64 F.3d 1266 (9th Cir. 1995) (due process required BIA to afford Indian tribe a meaningful hearing before denying the Tribe's petition for federal recognition). Here, Defendants provided SVBPI with no notice or opportunity to be heard prior to issuing the March 27 Recission.

The March 27 Rescission deprives SVBPI of the ability to pursue the most economically valuable use of its trust land[1]—gaming—which constitutes a vested and legally protected property

---

[1] The Department's Finding of No Significant Impact for the acquisition of the Vallejo

interest. The Constitution protects more than tangible property interests.   "'Because the
Constitution protects rather than creates property interests, the existence of a property interest is
determined by reference to 'existing rules or understandings that stem from an independent source'
such as state *or federal law*." *Reid v. Mayorkas*, No. CV 24-2186 (RC), 2024 WL 4903785, at *5
(D.D.C. Nov. 27, 2024) (emphasis added) (quoting *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
758 F.3d 296, 315 (D.C. Cir. 2014) and *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998)).
Here, IGRA provides, "a statutory basis for the operation of gaming by Indian tribes as a means
of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25
U.S.C. § 2702(1). The Eligibility Determination was issued pursuant to IGRA, 25 U.S.C. §
2719(b)(1)(B)(iii) and its implementing regulations, 25 C.F.R. Part 292, which constitute
"independent source[s]" under federal law on which existing rules or understandings are founded.
The Eligibility Determination represents a final agency action, the product of a completed and
closed administrative record, which confirmed SVBPI's right to conduct gaming on the Vallejo
Site under IGRA. As such, it vested in the Tribe with a property right – the right to conduct gaming
on the Vallejo Site. Gaming on the Vallejo Site is not a speculative or undeveloped interest for the
Tribe; it is the express economic development purpose for which the land was acquired and taken
into trust by the United States. *See*, Complt., Ex. B. The rescission of the Eligibility Determination
immediately deprives SVBPI of that use and thus constitutes the deprivation of a concrete and

---

Site considered non-gaming alternative uses of the property, but rejected such alternatives
because under such alternative uses, "economic benefits would be reduced" or "would not meet
the stated purpose of facilitating economic development, tribal self-sufficiency, and self-
determination." https://www.scottsvalleycasinoea.com/wp-content/uploads/2025/01/Final-EA-
FONSI-011425.pdf at pp. 2 – 3.

valuable property interest. Even if the Rescission is later deemed unlawful or reversed, the harm of delay—lost opportunity, impaired contractual rights, and disruption of reliance interests—will already have occurred.

The Eligibility Determination also enabled SVBPI to undertake binding contractual and financial commitments based upon the Eligibility Determination, including contracts with vendors for infrastructure planning, water and wastewater engineering, environmental compliance, and technical site assessments.  Complt., ¶ 23, ECF No. 1. Davis Decl. ¶¶ 12-22.  Indeed, since the January 10 Eligibility Determination, SVBPI has authorized the payment of over $1.8 Million in project related invoices pursuant to such contracts. Davis Decl., ¶ 13.  "Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States." *Lynch v. United States*, 292 U.S. 571, 579 (1934).  The rescission of the Eligibility Determination also places SVBPI's property interests in such contracts in jeopardy.

SVBPI also has a legally protected interest in the exercise of its sovereign authority to regulate and conduct gaming on the Vallejo Site.  "The Supreme Court has consistently recognized that a tribe has an interest in protecting tribal self-government."  *Mashantucket Pequot Tribe v. Town of Ledyard*, 722 F.3d 457, 463 (2d Cir. 2013) (citing *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1230 (11th Cir.2000), *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136 (1980), and *Ramah Navajo Sch. Bd. v. Bureau of Revenue of N.M.*, 458 U.S. 832, 845, (1982)). "[C]ourts have long recognized that tribes have legally protected rights in their sovereignty."  *Mille Lacs Band of Ojibwe v. Cnty. of Mille Lacs, Minnesota*, 508 F. Supp. 3d 486, 506 (D. Minn. 2020); Indeed, a tribe has a legally protected interest in exercising its inherent sovereign authority to enforce tribal law.  *See Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144,

20

1153 (9th Cir. 2017); *see also Confederated Tribes & Bands of the Yakama Nation v. Yakima Cnty.*, 963 F.3d 982, 989 (9th Cir. 2020). Here, the March 27 Recission immediately, and without notice or an opportunity to be heard, terminated SVBPI's sovereign authority to apply its laws to gaming activities over the Vallejo Site, pursuant to its NIGC-approved Gaming Ordinance. In fact, the March 27 Recission immediately transferred the applicable gaming laws on the Vallejo Site from the laws of SVBPI to the laws of the State of California. *See* 18 U.S.C. § 1166 (applying "all State laws pertaining to the licensing, regulation, or prohibition of gambling" to Indian Country, unless such gambling is conducted pursuant to the IGRA, 25 U.S.C. § 2701, et seq.).

The March 27 Recission also jeopardizes SVBPI's ongoing tribal-state compact negotiations with the State of California for the conduct of gaming on the Vallejo Site, pursuant to IGRA, 25 U.S.C. § 2710(d)(3)(A). *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1024 (9th Cir. 2002) ("The sovereign power of Indian tribes to negotiate [gaming] compacts" is a legally protected interest). As noted above, by rescinding the Eligibility Determination, Defendants unilaterally rendered the Vallejo Site currently ineligible for gaming under IGRA, and applied California's gaming laws to the Vallejo Site. *See*,18 U.S.C. 1166. As such, the March 27 Recission removes the legal foundation for engaging in gaming compact negotiations, and deprives SVBPI of its legally protected sovereignty interests.

Despite receiving no prior notice from the Department before the March 27 Rescission, SVBPI acted swiftly and in good faith to engage Defendants in consultation. On March 31, 2025—just one business day after receiving the rescission letter— counsel for the Tribe submitted a formal request for consultation through the Department's official portal and followed up with direct communication to the Assistant Secretary's scheduler to underscore the urgency of the matter.

Locklear Decl. ¶¶ 3-5. Nevertheless, as of the date of this filing, the Department has not acknowledged the request, offered a response, or scheduled any consultation Locklear Decl. ¶6. This lack of consultation with SVBPI is in disregard of Defendant's legal obligations and the principles of government-to-government engagement.

The complete absence of notice or an opportunity to be heard prior to Defendants' issuance of the March 27 Recission, which deprived SVBPI of valuable and legally protected property and sovereignty interests noted above, constitutes an immediate and ongoing violation of SVBPI's constitutional right to procedural due process.

### C. The Senior Advisor to the Secretary of Interior Lacked Authority to Issue the Decision to Rescind the Eligibility Determination.

As discussed above, there is little question that the letter rescinding the Eligibility Determination is a final agency decision, or action. Among the many problems to which this gives rise is the fact that a senior advisor to the Secretary does not have authority to issue decisions on behalf of the agency, let alone final decisions. The March 27 Rescission purporting to rescind the Eeligibility Determination cites as authority 43 C.F.R. § 4.5. While section 4.5 provides some authority to the Secretary to revisit decisions of agency employees it does not allow the delegation of that authority to a senior advisor who is not a Presidentially Appointed, Senate-Confirmed ("PAS") officer.

It is "axiomatic that an agency is bound by its own regulations." *Texas v. EPA*, 726 F.3d 180, 200 (D.C. Cir. 2013) (quoting *Panhandle Eastern Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979); *see Crawford v. FCC*, 417 F.3d 1289, 1297 (D.C. Cir. 2005) ("[A]n agencies failure to follow its own regulations is fatal to deviant action") (quoting *Florida Institute*

*of Technology v. FCC*, 952 F.2d 549, 553 (D.C. Cir. 1992)). Here, 43 C.F.R. § 4.5, the regulation cited in the March 27 Recission, explicitly reserves authority to review a decision of Departmental employees to the Secretary, exclusively. It does not provide such authority to the Secretary "or an authorized representative exercising delegated authority." Thus, under the plain unambiguous language of 43 C.F.R. § 4.5, the March 27 Rescission is ineffective because it was issued by a departmental employee who lacked authority to issue a decision rescinding the Eligibility Determination.

In addition to violating the plain language of 43 C.F.R. § 4.5, the Department's apparent attempt to delegate authority to a Senior Advisor raises important constitutional questions. The Appointments Clause provides that the President shell appoint "Officers of the United States" with the advice and consent of the Senate, "but the Congress may by Law vest the Appointment of such inferior Officers as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. While the Secretary, and even the Assistant Secretary are appointed by the President with the advice and consent of the Senate, a Senior Advisor, who is a subordinate employee is not.

The decision to rescind a determination that land is gaming eligible is a significant exercise of federal power. It is an even more significant exercise of federal power here, because the Eligibility Determination came after litigation and after the Department by its own acknowledgement conducted a thorough review of the entire record before it. To be sure, a gaming eligibility determination carries significant consequences for the jurisdictional balance between the federal government, the states and the tribes.

The Appointments Clause does not permit a power as weighty as rescinding a gaming eligibility determination to be vested in an inferior officer, or employee, who is not a Senate-confirmed officer. Although the Supreme Court has not established as comprehensive definition of "inferior officer," the Court has observed that it is "evident that 'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 663 (1997). While inferior officers can do many things, they do not have the authority to take final actions on behalf of an agency. Moreover, nothing in 43 C.F.R. § 4.5 authorizes them to exercise the Secretary's authority to review prior agency decisions.

### D. The Secretary lacks authority under either general administrative law principles or 43 C.F.R. § 4.5 to rescind the gaming eligibility determination.

In his March 27, 2025, letter, Defendant Davis cites 43 C.F.R. § 4.5 as the basis of the Department's authority. Complt., Ex. B. p.1. In pertinent part, Section 4.5 provides that the Secretary's reserved authority includes "[t]he authority to review any decision of any employee or employees of the Department, including any administrative law judge or board of the Office, or to direct any such employee or employees to reconsider a decision." 43 C.F.R.§ 4.5(a)(2).   The Department lacks the authority to take the action Mr. Davis announced in the March 27, 2025, letter because the decision to do so is untimely and because the basis for the decision does not comport with Section 4.5.

### 1.  The Secretary's general authority to review final agency action is limited.

While an agency generally has some authority to reconsider its decisions, that authority is limited. In particular, an agency may undertake reconsideration only if it does so within a short and reasonable time. *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014); *Mazaleski*

*v. Truesdell*, 562 F.2d 701, 720 (D.C. Cir. 1977); *Dun & Bradstreet Corp. Found. v. United States Postal Serv.*, 946 F.2d 189, 193 (2nd Cir. 1991) (citing *Bookman v. United States*, 197 Ct.Cl. 108, 453 F.2d 1263, 1265 (1972)); *Belville Mining Co. v. United States*,  999 F.2d 989, 997-999 (6th Cir. 1993); *Voyageur Outward Bound School v. United States*, 444 F.Supp.3d 182 (D.D.C. 2020) (vacated on other grounds); *Tesoro High Plains Pipeline Company LLC, v. United States*, 2024 WL 3359433, *6-7 (D.N.D. 2024). What is a short and reasonable time period will vary with each case, but absent unusual circumstances the correction must occur within a short period of time measured in weeks.  *Mazaleski*, 562 F.2d at 720; *Belville Mining*, 999 F.2d at 1000. Once a reasonable time period has run, "there is no longer an opportunity to correct the procedural error retroactively." *Belville Mining*, 999 F.2nd at 1000 (quoting *Gratehouse v. United States*, 206 Ct.Cl. 288, 512 F.2d 1104, 1109 (1975)).

 *Belville* laid out numerous factors courts should consider to determine whether an agency's reconsideration decision was timely, including" (1) the complexity of the decision; (2) whether the decision was factually or legally based; (3) whether the agency acted according to its general procedures for review; (4) whether the express time limit for appeals set forth in the regulations had run; (5) whether legally cognizable property interests had arisen through the initial decision; (6) whether the plaintiff had acted in reliance on the initial decision; (7) whether the agency had attempted to use a pretext to justify reconsideration; and (8) the probable impact of an erroneous agency decision absent reconsideration. *Belville Mining*, 999 F.2d at 1001. Courts in the D.C. Circuit follow this formula. *Voyageur Outward Bound School*, 444 F.Supp. 3d at 195.

 As applied here, these factors are either neutral or weigh in favor of concluding that the Department's March 27 Reconsideration was untimely.  First, the Reconsideration Decision was

not complex; Mr. Davis merely indicated that the Department had not considered evidence--evidence that could not be considered because it was received after the 2022 Remand and after the Administrative Record for the underlying decision was closed.  Second, the March 27 Reconsideration appears to be factual and based upon evidence that that was submitted by third parties after the administrative record had closed, and thus cannot be considered.  Third, the Department's March 27 Reconsideration is not in accordance with its regulations because it seeks to add evidence to the administrative record in contradiction to the express limits of 43 C.F.R. § 4.5. Fourth, the time for appeals factor has no application as the decision constituted a final agency action (which is already under judicial review in other pending cases). Fifth, the underlying decision gave rise to legally cognizable and important property rights—namely, the right to conduct gaming on the property. Sixth, SVBPI reasonably acted in reliance on the underlying decision. Seventh, the agency is using the pretext to justify reconsideration. Finally, there is little likelihood of the impact of an erroneous decision, considering the weighty consideration the Department gave to the issue initially.

Highlighting just a few of the *Belville* factors firmly establishes the untimeliness of the Department's Reconsideration Decision.

### a.  The decision is not complex.

While the issues underlying the Department's January 10, 2025, final agency action may have been complex, the decision expressed on March 27, 2025, was not. As the letter indicates, the Department's decision is simple—the Department wishes to review unidentified evidence submitted after the 2022 Remand and in a case where the Department previously determined that re-opening the record was neither necessary nor appropriate. The only complexity the decision

raises is whether the Department has authority to issue and follow through on this decision – which, as explained herein, it does not.

### b. The March 27 Rescission immediately upsets legally cognizable property interests.

As the March 27 Rescission acknowledges, the underlying decision carried with it significant rights. In particular, the Eligibility Determination declared that the land at issue was gaming-eligible under the IGRA. Put differently, the underlying decision directly authorized the SVBPI to regulate and conduct class III gaming on the property. Once the land is gaming eligible, there is practically no bar to the SVBPI authority to conduct gaming on that land. As noted above, that use is a valuable property right protected by the Equal Protection Clause of the Constitution. To be sure, the right to game for a restored Indian tribe such as SVBPI is arguably one of the most significant rights that can be obtained. And there is no escaping that the right is tied to the land and arose directly from the Department's Eligibility Determination.

The March 27 Rescission directly and expressly purports to withdraw SVBPI's right to game on the property. Specifically, the March 27 Rescission expressly rescinds the Eligibility Determination, while purporting to maintain the trust acquisition of the property, and states "neither the Tribe nor any other entity or person should rely on the [prior] Gaming Eligibility Determination." The March 27 Rescission, therefore, fundamentally changes the legal status and nature of the property and denies SVBPI a right associated with the property that the Department's initial decision granted.

### c. SVBPI's reliance on the January 10, 2025, final decision weighs against reconsideration.

Courts approach   an agency's rescission of a prior decision with special caution in instances where a party has relied on its finality. *Belville Mining*, 999 F.2d at 999; *U.S. v. Prieto*, 655 F. Supp. 1187, 1188 (D.D.C. 1987).  As one court noted. "[i]t sets an extremely dangerous precedent to act outside the bounds of normal procedures and to internally reconsider an agency action" when parties who have relied on the initial decision have acted in reliance on the initial decision. *See  Rosebud Sioux Tribe v. Gover*, 104 F. Supp. 2d 1194, 1201 (D.S.D. 2000) (vacated on other grounds); *see also Conf. Tribes of the Warm Springs Res. of Oregon v. United States*, 177 Ct.Cl. 184, 1966 WL 8893 (1966) (stating it was "especially dangerous" for an agency to reconsider an earlier decision when there had been "reliance on the assumed finality of the decision").

Here, SVBPI has significantly relied upon the Department's initial decision that the property is gaming eligible.  Reasonably relying on the finality of the Department's decision, SVBPI has entered into and authorized numerous agreements relating to the development of the land specifically for gaming purposes. Davis Decl., ¶ ¶ 12-13. These include contracts for environmental analysis, infrastructure work related to water and wastewater systems as well as technical studies. *Id*. Authorized payments pursuant to these agreements total nearly $2,000,000.00, a significant outlay for a Tribe with no other significant economic development opportunities. Davis Decl., ¶ 13.  Additionally, SVBPI has agreed to reimburse the City of Vallejo for costs to evaluate and analyze potential impacts and payments to mitigate those impacts which are on the cusp of being memorialized in an intergovernmental agreement between SVBPI and the City. Davis Decl., ¶ 14.  Based on the reasonable assumption that the January 10, 2025, decision

was final, SVBPI has also begun negotiations with the State of California for a Tribal-State Gaming Compact specific to the site as required by the IGRA. Davis Decl., ¶ 16.

Not only has SVBPI relied on the Eligibility Determination from a financial standpoint, it has also relied on the decision from a governmental standpoint. Based on the initial decision, SVBPI has adopted a gaming ordinance that governs the conduct of gaming on the property. As required by the IGRA, SVBPI submitted its gaming ordinance to the Department on January 28, 2025, immediately after the initial decision. Davis Decl., ¶ 15.  Following technical assistance from the Department, through the NIGC, the Tribe withdrew the gaming ordinance and submitted a revised ordinance on March 4, 2025. *Id*. Notably, on March 25, 2025, (two days before the March 27 Rescission was issued) the NIGC Chairwoman approved SVBPI's gaming ordinance, which authorized SVBPI to regulate and operate gaming on the property subject to the Eligibility Determination.   Not only did the Department know that the SVBPI was acting in reliance on the assumption that the Eligibility Determination was final, but the Department was also engaging with SVBPI as if there were no potential issues right up to the day it purported to rescind the determination.

### d.  The Department's claimed basis for reconsideration is clearly a pretext.

As the procedural background of this case reflects, SVBPI's favorable "restored lands" decision was, as would be expected, a lengthy and comprehensive pursuit.  As laid out, SVBPI first submitted a request for an Indian Lands Opinion under 25 U.S.C. § 2719 and 25 C.F.R. Part 292 on January 28, 2016. (Davis. Decl. ¶ 5).  On February 7, 2019, the Department issued a negative Indian Lands Opinion, based on the finding that SVBPI had a significant historical connection to the land and and, as such, it did not qualify as "restored lands" under the IGRA. (Davis

Decl. ¶ 6). SVBPI sued the Department, challenging the Department's decision.  (Davis Decl. ¶ 7).  On September 30, 2022, the United States District Court for the District of Columbia determined that the Department's decision to issue a negative Indian Lands Opinion was arbitrary and capricious.  (Davis Decl. ¶7).  Accordingly, the District Court remanded the matter to the Department with instructions to apply the proper cannons of construction to its review. *Scotts Valley Band of Pomo Indians v. U.S. Dep't of the Interior*, 633 F. Supp. 3d 132 (D.D.C. 2022). On remand and after a careful and thorough review of the Administrative Record, the Department issued a final decision on January 10, 2025, in which it found that, under the proper canons of construction, a positive Indian Lands Opinion was necessary. (Davis Decl. ¶ 8). Consequently, the land was deemed gaming eligible under the IGRA's "restored lands" exception to the prohibition against gaming on lands acquired after October 17, 1988.

On January 20, 2025, a new Administration took office. Within just two months of the change and the resulting changes in the Department's leadership, the Department has now done an about-face. It is now purportedly rescinding its prior positive Indian Lands Opinion, reopening the matter to additional review and evidentiary review, despite the Administrative Record having been closed and the Department having conducted a considerable review and evaluation. Considering the timing of events, the pretext of the Department's March 27 Rescission is self-evident.  To be sure, courts are reasonably suspect when agencies withdraw prior decisions within close time proximity to a change in an Administration.  *See Coteau Properties Co. v. Dep't of Interior*, 53 F.3d 1466, 1477-79 (8th Cir. 1995); *see also Tesoro High Plains Pipeline Company, LLC*, 2024 WL 3359433, *6-8.

As in *Coteau* and *Tesoro,* there is no "smoking gun" in the record that the Department previously overlooked. The decision now being rescinded for reconsideration was a multi-year administrative process that included a federal court remand. After the remand, the Department took over two years to fully review, consider, and evaluate the record pursuant to the proper canons of construction. The Department's final decision was thoughtful and thorough. After the change in Administrations, it took only two months for the Department to completely change course and seek to undue years of work – all based on sheer speculation that there might be some additional, extra-record evidence that exists which will form the basis for a different result. Looked at from another vantage point, once the Administration had its people in place, it acted immediately and without caution or care to revert to the position it preferred when it was previously in power.

The fact that the decision to rescind the January 10, 2025, final action and reconsider the decision is pretextual is confirmed by the reasons Defendant Davis gave for the decision. As discussed above, in his March 27 Rescission, Mr. Davis indicated that the reason the Department was rescinding its final decision and reopening it is due to a concern that "evidence submitted after the 2022 Remand" may not have been considered. Complt. Ex. B. ECF No. 1. However, this flies in the face of the fact that after the 2022 Remand, the Department made the conscious and discretionary decision not to reopen the Administrative Record. The Department made the decision because it had all the necessary information, having conducted a multi-year review process beforehand.

Critically, the decision of whether to reopen the Administrative Record *after remand* to accept new or additional evidence is purely discretionary. *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed Cir. 2012) ("The decision to reopen the record is best left to the agency

…"). Here, the Department exercised its discretion to issue its decision after remand based on the existing administrative record. The mere fact that, months after a final decision was issued, and immediately after the new Departmental officials and employees took their positions after the administration change, the Department took such an about-face, ignoring multiple final decisions of prior employees, suggests strongly the pretextual nature of the March 27 Rescission.

####    e.    The Probable Impact of an Erroneous Agency Decision Absent Reconsideration is Minimal.

The probable impact of the Department's January 10, 2025, final agency action is that gaming will occur on the underlying property. Plain and simple. While the fact that gaming will occur may give rise to the sense that this is a significant impact, it is not.

As the Department indicates in the March 27Rescission, the Department's action here does not impact the trust status of the underlying property. As Mr. Davis explained it, "the Trust Determination still stands and the Vallejo Site remains in trust[.]" *Id.* Critically, the Trust Determination Defendant Davis references is inextricably intertwined with gaming. As part of the trust acquisition process, the United States conducted an extensive environmental analysis to determine the impacts of taking the property into trust. *See,* Ex. A. (Mitigated Finding of No Significant Impact). In particular, the Environmental Assessment for the acquisition specifically analyzed the impacts of gaming on the property. *Id.* This analysis included not only purely environmental impacts, but also the economic impacts of taking the land into trust for gaming purposes.

Specifically, the trust acquisition Environmental Assessment considered four (4) alternatives: (1) transfer of the project site into trust for gaming and housing purposes; (2) transfer of the project site into trust for only gaming purposes; (3) transfer of the project site into trust for

future development of a commercial center featuring hotels, and tribal housing and administration structure; and (4) declining to taken the land into trust. *Id.* Of these alternatives, the Department found that the first – taking the land into trust for gaming and tribal housing purposes – was the preferred option. *Id.* The Department made this determination only after determining that acquring the property into trust for gaming purposes  "is not a federal action that would result in significant adverse effects to the quality of the human environment with mitigation." *Id.*

It is essential to reemphasize that the March 27Rescission does not challenge the analysis the Department conducted regarding the potential impact of gaming on the property. The Department expressly takes no issue with the finding that gaming will have no significant adverse effects on the human environment. Instead, the Department's letter focuses only on the "restored lands" opinion. While reversing the restored lands opinion would unquestionably disqualify the property from being gaming eligible, it does not address the impacts of allowing gaming to occur absent reconsideration. That is because the Department has already studied those impacts and, after careful review, has determined that the impact of allowing gaming on the property will be insignificant.

The probability of impacts also has an inverse component.  Here, SVBPI has obtained a favorable "restored lands" decision and a final agency action taking the property into trust for gaming purposes. Having secured these positive final agency action, SVBPI has the benefit of the arbitrary and capricious standard of review associated with challenges the trust acquisition under the Administrative Procedure Act. That standard creates a heavy burden for parties that do, and have, challenged the trust acquisition. *See Transmission Access Policy Study Group v. F.E.R.C.*, 225 F.3d 667, 714 (D.C. Cir. 2000) (A party seeking to have a court declare an action to be arbitrary

and capricious carries 'a heavy burden indeed.") To be sure, in reviewing agency action under the arbitrary and capricious standard a court will not substitute its own judgement for that of the agency, but will examine only "whether the decision was based on a consideration of the relevant factors and where there has been an error of judgment, whether the agency's policy choice is supported by "substantial evidence," and whether there is a rational connection between the facts and the choice made." *Bangor Hydro-Electric Co. v. F.E.R.C.*, 78 F.3d 659, 663 n.3 (D.C. Cir. 1996). Here, while there is little probable impact from proceeding without reconsideration, the impact of proceeding with reconsideration is significant because it deprives SVBPI of the ordinary standard of review it would ordinarily, and rightfully, enjoy.

### 2. Section 4.5 does not support the Secretary's decision to rescind the January 10, 2025, final agency action.

43 C.F.R. In pertinent part, Section 4.5 provides:

*Secretary*. Nothing in this part shall be construed to deprive the Secretary of any power conferred upon the Secretary by law. The authority reserved to the Secretary includes, but is not limited to:
…..
The authority to review any decision of any employee or employees of the Department, including any administrative law judge or board of the Office, or to direct any such employee or employees to reconsider a decision.
…..
*Exercise of reserved power*. If the Secretary or Director assumes jurisdiction of a case or reviews a decision, the parties and the appropriate Departmental personnel will be advised in writing of such action, the administrative record will be requested, and, after the review process is completed, a written decision will be issued.

43 C.F.R. § 4.5.

The problem for Defendants is that Section 4.5 does not provide the Department with the authority it has purported to exercise in the March 27, 2025, letter claiming to rescind its January

10, 2025, final action and reopening the record for review. Section 4.5 does not provide the Secretary with unbridled authority to reopen the record after a final agency decision is issued. The same equitable concerns found in the "timeliness" consideration courts use to evaluate an agency's inherent authority to reconsider its prior decisions must necessarily apply to any review undertaken pursuant to Section 4.5. Without some limiting factors, no one can reasonably rely on any final agency action. Indeed, if the Secretary may reopen any final action at any time, it would be foolhardy to ever rely on a final action. This is especially true when a plaintiff has relied extensively on the finality of the agency's action and the reconsideration impacts a weighty right.

This case presents a compelling example illustrating the importance of timeliness. As discussed above, SVBPI worked for years to obtain a final decision. It negotiated through three different Administrations and obtained relief from the United States District Court to secure a favorable restored lands determination. Once it received the favorable determination, it acted immediately in reliance on the assurance that the decision, which the Department stated was final, was indeed final. To that end, SVBPI expended nearly $2,000,000.00 and entered into numerous contracts, all of which followed from the Department's January 10, 2025, final action. But for that final action, SVBPI would not have undertaken any of these obligations. Then, out of the blue, with no prior notice or discussion, Department officials put in place by a new Administration changed everything. Such an attack on finality completely undermines not only the interest in finality but also the security of those engaging with the Department.

For the reasons discussed above in Section C(1)(a)-(c), the March 27 Rescission cannot be considered timely for purposes of review and reconsideration under Section 4.5.

In addition to necessarily requiring an imputed timeliness factor, Section 4.5 also does not allow for the manner in which the Department is proceeding here. In the March 27 Rescission, the Department indicated that the purpose of the reconsideration is to consider "additional evidence" that was submitted after the 2022 Remand, and after the Administrative Record in the underlying matter was closed. However, section 4.5 does not provide the Secretary with such broad authority when undertaking reconsideration.  To the contrary, Section 4.5(c) provides that:

> If the Secretary or Director assumes jurisdiction of a case or reviews a decision, the parties and the appropriate Departmental personnel will be advised in writing of such action, the administrative record will be requested, and, after the review process is completed, a written decision will be issued.

43 C.F.R. § 4.5(c). Here, the March 27 Rescission goes well beyond the confines of Section 4.5(c). As the Department explains, the purpose of reconsideration is not to review the Administrative Record to ensure that the Department reached the correct conclusions based on the information available at the time of the decision, but to add late-acquired evidence to the Administrative Record, presumptively to reach a different conclusion.  Section 4.5(c) does not provide for the augmentation of the Administrative Record or the consideration of new evidence that the plaintiff has previously not seen and to which it has had no chance to respond. Nor does the March 27 Rescission point to any other rule or regulation that allows it to reopen the Administrative Record well after a matter has concluded in order to reconsider a prior Department decision.  Accordingly, the purposes of the March 27 Rescission in this instance do not comport with the Department's regulations or with the scope of review that Section 4.5 allows.

Part of the problem here arises because the Department has not promulgated rules relating to the reconsideration of its decisions. At least one court has expressed concerns about such

situations. As the Second Circuit stated, with respect to a reconsideration of a final agency determination:

> [W]e hasten to express our discomfort with governmental agencies that either fail or refuse to promulgate rules concerning reconsideration of their decisions. We believe that the absence of such rules at agency level can result in administrative unfairness to individual claimants. Indeed, it is quite clear that an agency without these kinds of rules has the potential to give claimants the proverbial run-around.

*Dun & Bradstreet*, 946 F.2d at 195. Interpreting Section 4.5 to allow the Department to vacate agency decisions well after the parties have acted in reliance on the agency's decisions, for reasons that are transparently pretextual and in open-ended proceedings with no guardrails – such as the situation here – results in just that "run around" scenario, which leave parties in limbo and undermine confidence in the true finality of any agency action.

Here, although the time between the underlying decision and the Department's issuance of the March 27 Rescission is just short of three months, the circumstances dictate that the reconsideration is untimely. Consequently, the Department cannot un-ring the bell and withdraw its January 10, 2025, final decision for pretextual purposes and in a manner that does not comport with the Department's regulations relating to review of its decision under 43 C.F.R.§ 4.5.

### E.  The March 27 Rescission Threatens the Trust Acquisition Purpose and Intrudes on NIGC's Authority.

In addition to violating the APA, the March 27 Rescission undermines the fundamental purpose for which the subject land was placed into trust: economic development through gaming. The Eligibility Determination explicitly concludes that the land "qualifies as restored lands" and that "the Band may conduct gaming on the Vallejo Site once it is acquired in trust" consistent

with the restored lands exception under IGRA, provided the Tribe is not gaming on other lands (which it is not). (Complt., Ex. A, pg. 2).

If the Eligibility Determination may no longer be valid, then the trust acquisition itself is called into question. The Tribe's application, the Department's review, and the final decision were all predicated on the express objective of enabling the Tribe to pursue gaming under IGRA. The Department cannot now rescind its gaming eligibility determination without threatening the validity of the trust acquisition—an action that creates legal uncertainty, chills investment, and risks unraveling years of tribal planning and federal review.

Moreover, once land is acquired in trust, the Department's role in evaluating gaming eligibility under IGRA concludes. At that point, it is the National Indian Gaming Commission (NIGC) and the Tribe —not the Department —that have primary authority to evaluate and regulate gaming activity on Indian lands. The Department's attempt to reassert jurisdiction post-acquisition intrudes on the statutory authority of NIGC and disrupts the division of responsibilities established by Congress.

Indeed, NIGC has already exercised its authority in this matter. On January 28, 2025, the Tribe submitted a request for approval of its tribal gaming ordinance. In his transmittal letter to the NIGC Acting Chairwoman Sharon Avery, Tribal Chairman Shawn Davis advised that, on January 10, 2025, the Department determined that the Tribe is eligible to conduct gaming under the "restored lands" exception of IGRA and that the determination applied to the Vallejo Site, which had been accepted the land into trust for the Tribe.

After engaging in minor technical assistance, the Tribe revised and resubmitted the ordinance on March 7, 2025. On March 25, 2025, the NIGC Chair approved the Tribe's revised

gaming ordinance pursuant to 25 U.S.C. § 2710. It is effective upon approval. That approval is dispositive as to the Tribe's right to conduct gaming under IGRA on its trust land. The approved ordinance, issued by the agency charged with implementing IGRA, forecloses further argument as to the eligibility of the land for gaming purposes.

The Department's rescission is *ultra vires,* and immediate injunctive relief is necessary to preserve the status quo and prevent further irreparable harm while these legal issues are resolved.

## II.    SVBPI FACES IMMINENT AND IRREPARABLE HARM WITHOUT COURT INTERVENTION.

SVBPI is already incurring serious harm as a direct result of the March 27 Rescission. As Tribal Chairman Shawn Davis testifies, the Tribe committed substantial resources in reliance on the Eligibility Determination, — resources that are now placed at risk due to the Department's abrupt and procedurally defective reversal. Davis Decl. ¶¶ 21-22.

Following the issuance of the Eligibility Determination, the Tribe authorized over $1.88 million in project-related invoices, entered into multiple contracts with private vendors for infrastructure planning, water and wastewater engineering, environmental compliance, and technical site assessments, and presented the City of Vallejo with a signed agreement to reimburse the City for its review and planning costs in connection with a forthcoming intergovernmental agreement. Davis Decl. ¶¶ 11-14. These obligations were undertaken with the understanding that the Department's decision was final and that the Vallejo Site was trust land eligible for gaming under IGRA. Davis Decl. ¶ 17. As noted above, the Tribe also proceeded to formalize its regulatory and governmental relationships. On January 28, 2025, SVBPI submitted its tribal gaming ordinance to the (NIGC for review and approval. Following a brief technical assistance process, a revised ordinance was approved on March 25, 2025. In parallel, the Tribe initiated compact

negotiations with the State of California, formally requesting negotiations on January 17, 2025, which the Governor accepted on March 4, 2025—and a negotiation session took place on March 27, 2025.

The Department's rescission letter directly exacerbates this harm by stating, in no uncertain terms, that **"[d]uring the pendency of this reconsideration, neither the Tribe nor any other entity or person should rely on the Gaming Eligibility Determination."** This express instruction injects immediate and severe legal uncertainty into the Tribe's ongoing contractual obligations and regulatory undertakings. It effectively halts project momentum, undermines the Tribe's credibility with public and private stakeholders, and frustrates the Tribe's ability to negotiate in good faith with the State and local governments.

As a federally recognized Indian tribe with no existing gaming facility and few economic alternatives, SVBPI cannot absorb such disruption. Davis Decl. ¶ 22. As noted above, this Court has recognized that harm to tribal sovereignty, jurisdiction over trust land, and ongoing economic development constitutes irreparable harm warranting injunctive relief. See *Mashpee Wampanoag Tribe v. Bernhardt*, No. CV 18-2242 (PLF), 2020 WL 3034854, at *3 (D.D.C. June 5, 2020) (even partial interference with a Tribe's sovereignty over its land is irreparable harm); *Ute Indian Tribe of Uintah & Ouray Reservation v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015).

Absent court intervention, the Department's action threatens not just this project, but the Tribe's long-term economic viability and its ability to exercise sovereign authority over trust lands. That is the very definition of irreparable harm.

### III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF.

The balance of equities in this case weighs overwhelmingly in favor of granting a

temporary restraining order. SVBPI faces immediate and concrete harms to its sovereign authority, economic development efforts, and government-to-government relationships. In contrast, Defendants would suffer no legally cognizable harm from being temporarily restrained from reopening an administrative process that, by law, has already been completed.

SVBPI has already expended substantial resources in reliance on the Eligibility Determination -- resources directed toward planning, contracting, intergovernmental coordination, and financing based on the Eligibility Determination. Suspending that decision without due process or legal authority inflicts severe disruption not just on SVBPI's plans, but on its credibility with funding sources, regulatory partners, and municipal partners such as the City of Vallejo. The March 27 Rescission has already introduced legal uncertainty that jeopardizes millions of dollars in investment and delays critical infrastructure and regulatory planning on trust land. The D.C. Circuit has recognized such disruption to tribal sovereignty and governance as a serious and irreparable harm that tips the equities in a Tribe's favor. *See Mashpee Wampanoag Tribe v. Bernhardt*, 2020 WL 3034854, at 3 (D.D.C. June 5, 2020). (Court finding Indian tribe will suffer irreparable harm if the Secretary is allowed to proceed with removing its land from trust pending remand, "with the most obvious harm that the Tribe will suffer is the "loss of sovereign authority over the Tribe's historic lands.")(internal quotations omitted).

On the other side of the ledger, Defendants will not be harmed in any material way by a Temporary Restraining Order ("TRO") that simply maintains the pre-rescission status quo pending judicial review. The March 27 Rescission purports to be "temporary" and lacks any statutory deadline or finality. Defendants retain full authority to litigate the merits of their position during the course of this action. No regulatory deadlines will be missed, and no urgent federal interests

41

are at stake. The only consequence of granting the TRO is that the Department will be required to follow established constitutional, administrative and legal procedures.

Moreover, no legitimate interest will be harmed by temporarily preserving the status quo, and certainly not those of third parties. Three Indian tribes are already challenging the Eligibility Determination through filed actions filed in this Court. Nothing in the requested TRO would preclude or impair their ability to continue litigating those claims, seek appropriate relief, or be heard on the merits. The TRO would simply prevent the Department from bypassing judicial review by reopening the administrative record and granting those tribes, in effect, the very relief they seek, without process, briefing, or legal justification. That is precisely the kind of administrative end-run that equitable relief is designed to prevent. Accordingly, there is no equitable interest—on the part of the government or of other Indian tribes—that weighs against the narrow and temporary relief sought here.

## IV.    NO BOND SHOULD BE REQUIRED.

The Court should not impose a security requirement in this litigation. *See e.g., Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL597959, at *19 (D.D.C. Feb. 25, 2025) (declining to impose bond and stating that the trial court has discretion to require no bond at all, and noting that it would "defy logic" to require bond in a case where the defendants—a federal agency and its director—would face no monetary injury from preliminary injunctive relief).    Here, the Plaintiff is a federally recognized Indian tribe without a gaming facility or any other meaningful source of economic development revenue. See Davis Decl. ¶ ¶ 10 and 22.  SVBPI has limited resources and has already undertaken significant financial obligations in reliance on the Eligibility Determination. The Court has broad discretion to dispense with the

42

bond requirement, particularly where, as here, Defendants face no risk of monetary harm. Therefore, the Court should waive any bond requirement under Rule 65(c).

## **CONCLUSION**

For the foregoing reasons, SVBPI respectfully requests that the Court grant a Temporary Restraining Order:

1. Enjoining the Department from reopening the administrative record related to the Eligibility Determination;

2. Enjoining the Department from considering or accepting any evidence not contained in the record as of 2019;

3. Reinstating and preserving the legal force and effect of the Eligibility Determination pending further order of the Court.

Dated: April 1, 2025                    Respectfully submitted,


                                        By:     /s/ Patrick R. Bergin

                                        Patrick R. Bergin (D.C. Bar No. 493585)
                                        PEEBLES BERGIN SCHULTE & ROBINSON LLP
                                        2020 L Street, Suite 250
                                        Sacramento, California 95811
                                        (916) 441-2700
                                        pbergin@ndnlaw.com

                                        Conly J. Schulte (D.C. Bar No. NE20158)
                                        PEEBLES BERGIN SCHULTE & ROBINSON LLP
                                        945 Front St.
                                        Louisville, CO 80027
                                        (303) 284-8228
                                        cschulte@ndnlaw.com

                                        Arlinda F. Locklear (D.C. Bar No. 962845)
                                        4113 Jenifer Street, NW
                                        Washington, DC 20015
                                        (202) 237-0933
                                        alocklearesq@verizon.net


                                        Attorneys for Scotts Valley Band of Pomo Indians