## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **SCOTTS VALLEY BAND OF POMO INDIANS**, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>**DOUGLAS BURGUM**, et al.,<br><br>Defendants. | Case No. 1:25-cv-00958 (TNM) |

## <u>MEMORANDUM ORDER</u>

Last month, the Department of the Interior did an about-face. It rescinded its decision allowing the Scotts Valley Band of Pomo Indians to conduct gaming on a parcel of land in Vallejo, California. The tribe launched this case against the Government. Just days before the rescission, two sets of neighboring Indian tribes had sued the Government separately, alleging that the Scotts Valley Band should not have rights to the parcel of land at all, much less gaming rights. The tribes from the two earlier actions now seek to intervene here. The property's previous owner also asks to intervene because the proceeds of its sale to the Scotts Valley Band depend on the new owners building a profitable casino. So the private owner does not want the Scotts Valley Band to be prevented from gaming on the Vallejo parcel.

Following binding precedent from an earlier iteration of this case, the Court holds that all four prospective intervenors lack Article III standing to intervene. *See Yocha Dehe v. Dep't of Interior*, 3 F.4th 427, 431 (D.C. Cir. 2021) (rejecting intervenor standing for the Yocha Dehe tribe in litigation involving the same land parcel). Their motions are denied for the reasons that follow.

## I.

Three federally recognized Indian tribes would like to weigh in on the Government's side.  The Yocha Dehe Wintun Nation and the Kletsel Dehe Wintun Nation—collectively, the "Patwin Tribes"—claim ancestral connection to the Vallejo parcel, though the federal government forced them from it in the early twentieth century.  *Yocha Dehe Wintun Nation et al. v. Dep't of Interior*, No. 25-cv-00867, Compl., ECF No. 1, ¶¶ 56–62.  They still jointly hold a "cultural easement" over the plot for their people to visit and preserve cultural resources.  *Id.* ¶¶ 62, 190.  But both tribes travel to Vallejo from their relocated reservation lands north in Yolo and Colusa Counties.  Patwin Mot. Intervene, ECF No. 16-1, at 9[1]; Decl. of Charlie Wright, ECF No. 16-3, ¶¶ 3–4.  On its reservation, the Yocha Dehe tribe has operated Cache Creek Casino Resort since the 1980s, primarily drawing customers from the San Francisco Bay Area.  Patwin Mot. Intervene at 9.  If the Scotts Valley Band built a casino in Vallejo, the Yocha Dehe's Cache Creek Casino Resort would suffer roughly 15.5% reduced revenues for over 5 years.  Decl. of Sarah R. Choi, ECF No. 16-2, ¶ 11 (relying on the Department of Interior's final estimate).  The United Auburn Indian Community occupies its own traditional lands two counties over in Placer County.  Auburn Mot. Intervene, ECF No. 15-1, at 7.  This tribe also operates a casino on its land that similarly draws customers from San Francisco.  *Id.*  The Kletsel Dehe tribe's reservation is "too remote and arid" for development.  Patwin Mot. Intervene at 9.

All three tribes contend that the Scotts Valley Band of Pomo Indians should not lay claim to the Vallejo parcel.  The Scotts Valley Band has been vying for the land for some time.  They are a federally recognized tribe that has "lived in Northern California since time immemorial."

---

[1] This opinion uses CM/ECF pagination.

Am. Compl., ECF No. 12, ¶ 7.  The tribe "became landless" after signing a treaty with the federal government in the nineteenth century that the Senate never ratified.  *Id.*  After a brief time with an assigned reservation, the tribe again became "landless" in the late 1950s after a statute terminated their reservation.  *Id.* ¶ 8.  In the 1990s, the Yocha Dehe say that the Scotts Valley Band received property in fee simple about 100 miles from Vallejo at Clear Lake.  *Yocha Dehe*, No. 25-cv-00867, Compl., ECF No. 1, ¶¶ 64–65.

In 2016, the Scotts Valley Band asked the Department of the Interior to designate the Vallejo parcel as its restored homeland, eligible for gaming.  Am. Compl. ¶ 10; 25 U.S.C. § 2719(b)(1)(B)(iii).  The Department denied the tribe's request in 2019, then after an appeal and remand for reconsideration, the Department changed its mind in January 2025.  Am. Compl. ¶¶ 19–23.  The January 10 designation (1) took the land "into trust" so that the Government held it for the benefit of the Scotts Valley Band; and (2) rendered the land eligible for gaming.[2]  *Id.* ¶ 24.  The Patwin and Auburn tribes submitted evidence to the agency throughout the litigation, contesting the Scotts Valley Band's ancestral claim.  Auburn Mot. Intervene at 8–10; Patwin Mot. Intervene at 11–13.

Once the land was designated, the Scotts Valley Band immediately got to work.  It began obtaining the necessary approvals and spending heavily to begin building its own casino.  Am. Compl. ¶ 25.  In late March, the Patwin and Auburn tribes sued separately to challenge the January 10 decision.  *Yocha Dehe*, No. 25-cv-00867, Compl., ECF No. 1; *United Auburn Indian Comm. v. Dep't of Interior*, No. 25-cv-00873, Compl., ECF No. 1.  Days later, the Government

---

[2] Letter from Scott J. Davis, Senior Advisor to the Sec'y of the Interior, U.S. Dep't of the Interior, to Hon. Shawn Davis, Chairman, Scotts Valley Band of Pomo Indians at 1 (Mar. 27, 2025), https://www.bia.gov/sites/default/files/media_document/2025.03.28_correction_scotts_valley_band_of_pomo_indians_partial_reconsideration_of_01.10.25_deci.pdf ("March 27 Letter").

"temporarily rescind[ed]" its decision to allow gaming on the Vallejo Parcel. *See* March 27 Letter, *supra* note 2. The land remains in trust. *Id.* at 1. The Government is reconsidering the gaming decision and inviting more evidence on the question. *Id.* The deadline for additional evidence is June 13. Mot. Extension of Time, ECF No. 28, at 3.

The Scotts Valley Band now sues the Department, saying that the rescission violated the APA, the Fifth Amendment, and the Indian Gaming Regulatory Act. Am. Compl. at 12–16. The Patwin and Auburn tribes seek to intervene supporting the March rescission. Patwin Mot. Intervene; Auburn Mot. Intervene. The previous owner of the Vallejo parcel, GTL Properties, would like to intervene on the Scotts Valley Band's side against the gaming rescission. GTL Mot. Intervene, ECF No. 21. As the Court will explain later, the structure of GTL's contract with the Scotts Valley Band depends on the proceeds from gaming. *See infra* Part IV. All three intervention motions are ripe for consideration. This Court has federal question jurisdiction under 28 U.S.C. §§ 1331, 1362.

## II.

Federal Rule of Civil Procedure 24 sets forward two paths to intervention. Fed. R. Civ. P. 24. The first path is intervention as of right, which a party may do "when it claims an interest relating to the property or transaction that is the subject of the action and disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." *Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 331 F.R.D. 5, 9 (D.D.C. 2019) (quoting Fed. R. Civ. P. 24(a)(2)).

To intervene as of right, parties also must show that they have Article III standing. *Yocha Dehe*, 3 F.4th at 430.[3]  "Article III of the Constitution limits the federal courts to the resolution of 'cases' and 'controversies,' meaning that the courts may only redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." *Teton Historic Aviation Found. v. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015) (cleaned up).  This limitation requires showing "standing to sue," or a "personal stake in the outcome of the controversy." *Id.*  A party must show that it (1) suffered an injury-in-fact that is concrete, particularized, and actual or imminent; (2) that the injury was likely caused by the defendant; and (3) that the injury would likely be redressed by judicial relief. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).

There is a second, permissive path to intervention.  The second section of Rule 24 allows courts to include parties when they "ha[ve] a claim or defense that shares with the main action a common question of law or fact," Fed. R. Civ. P. 24(b)(1)(B), an "independent ground for subject matter jurisdiction," and present these in a "timely motion."  *EEOC v. Nat'l Child.'s Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998).  "Permissive intervention is an inherently

---

[3] The Patwin tribes suggest that Article III standing may not be a necessary showing for intervention.  Patwin Mot. Intervene at 14 n.3.  The tribes are correct that *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020), held that intervenors must only demonstrate standing if they pursue relief broader than or different from the party *invoking* the court's jurisdiction. *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 663 (2019), suggests that a party "invoking a court's jurisdiction" is a plaintiff or appellant, not an appellee or defendant.  So the Patwin tribes argue that because they seek the same relief as the defendant, and defendant-intervenors need not show standing, they do not need to.  Patwin Mot. Intervene at 14–17.  The three tribes have sued separately seeking to set aside the full January 10 decision, trust and gaming together, which may differ from the Government's relief sought here, but the tribes do not expressly ask to set aside the land-in-trust decision in this suit. *Yocha Dehe*, No. 25-cv-00867, Compl., ECF No. 1, at 57; *United Auburn Indian Comm.*, No. 25-cv-00873, Compl. ECF No. 1., at 36 (asking the Court to "[s]et aside and vacate the January 10 Decision and all related approvals") (emphasis added).  Nonetheless, because the D.C. Circuit has previously required *in this case* that *this party* show Article III standing in order to intervene as of right on the defendant's side, and it did so after *Little Sisters of the Poor*, this Court follows suit. *Yocha Dehe*, 3 F.4th at 428; *see Farmer v. EPA*, 2024 WL 5118193, at *2 n.2 (D.D.C. Dec. 16, 2024) (noting tension between *Yocha Dehe* requiring standing for defendant-intervenors without analyzing the relief sought and the earlier-published *Little Sisters*); *id.* ("[S]ome judges in this district have continued to require all intervenors of right to demonstrate Article III standing, while others have not.").

discretionary enterprise that affords the Court wide latitude." *Sault Ste. Marie*, 331 F.R.D. at 9 (cleaned up). In exercising that discretion, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

### III.

In 2021, the D.C. Circuit held that the Yocha Dehe did not have Article III standing to intervene in this litigation. *Yocha Dehe*, 3 F.4th at 428. At the time, the Yocha Dehe wanted to intervene in the Scotts Valley Band's suit challenging the Department of Interior's initial denial of their Vallejo parcel request. *Id.* Now, Yocha Dehe and the other two tribes must show that the situation has changed enough to distinguish this precedent. Because they have not, their motions to intervene as of right are denied.

The D.C. Circuit concluded that the Yocha Dehe's injury was not imminent for two reasons. *Yocha Dehe*, 3 F.4th at 431. First, the tribe and its property were not "the direct subject" of the agency's challenged opinion. *Id.* This fact distinguished two cases involving parties that claimed "significant benefit" from an agency action and thus had standing to intervene in a potential change to the action. *Id.* at 430–31 (rejecting the tribe's arguments resting on *Crossroads Grassroots Pol'y Strategies v. Fed. Election Comm'n*, 78 F.3d 312 (D.C. Cir. 2015) and *Fund for Animals v. Norton*, 322 F.3d 728, 732 (D.C. Cir. 2003)). In the distinguished cases, either the intervenors or their property had been directly regulated by the agency action. *Id.* By contrast, Yocha Dehe and its reservation were not directly regulated by the agency's action on the Vallejo parcel. *Id.* So the Circuit found that these "significant benefit" agency-action cases did not support standing for Yocha Dehe. *Id.*

Second, the Yocha Dehe's injury was too attenuated to be imminent.  For a competing casino to inflict economic injury on Yocha Dehe's casino, the Scotts Valley Band would have to (1) successfully apply to the Department for the land to be taken in trust; (2) secure federal approval of a gaming compact that would have to be negotiated with the state of California; (3) obtain federal approval of a tribal gaming ordinance; and (4) likely get federal approval of a casino management contract.  *Id.* at 431; Scotts Valley Opp'n Patwin Mot. Intervene, ECF No. 31, at 24–25 (stating that it intends to outsource management so that it will require federal approval for a management contract).  The Scotts Valley Band says that it also must secure federal approval of development and financing agreements for a future casino.  Scotts Valley Opp'n Patwin Mot. Intervene at 24–25.

Though some of these steps have been accomplished, another major barrier has been erected.  True, the Scotts Valley Band received the parcel in trust on January 10, *see* March 27 Letter, and its gaming ordinance was approved last month, Am. Compl. ¶ 25.  But the Government's rescission of the gaming determination, of course, poses quite the problem for building a casino on the parcel.  *See* March 27 Letter.  The Scotts Valley Band lists further necessary steps beyond those in *Yocha Dehe*, including federal approval of development and financing agreements and complying with "mitigation measures" with the agency.  Scotts Valley Opp'n Patwin Mot. Intervene at 24–25.  In sum, Yocha Dehe finds itself in much the same position as in 2021.  It might endure economic harm if the Scotts Valley Band (1) successfully gains gaming permission from the Government; (2) finishes negotiating a gaming compact with California and wins federal approval of that compact; and (3) gets federal approval of the management contract for the casino.  The Scotts Valley Band's prospects of opening a casino depend on several steps, as they did in 2021.  So the Yocha Dehe's injury-in-fact remains too

attenuated to be imminent.  *See* Auburn Reply Mot. Intervene, ECF No. 35, at 13 (conceding these steps remain).

The D.C. Circuit held that Yocha Dehe did not have standing because of the combination of its "indirect relationship" to the agency action and the "as-yet remote nature of any harm to Yocha Dehe from a Scotts Valley casino."  *Yocha Dehe*, 3 F.4th at 431.  Because the tribe's situation has not changed significantly, neither has its standing to intervene.  The Kletsel Dehe claim the same injury-in-fact as the Yocha Dehe, so the analysis for one controls the other. Patwin Mot. Intervene at 9, 17–21 (referencing the "Patwin tribes" collectively when discussing standing).  In short, neither of the Patwin tribes has standing to intervene.

These same principles also distinguish this Court's previous opinion in *Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*. 331 F.R.D. at 9.  There, the intervenor tribes executed compacts with Michigan that ensured their direct revenue-sharing with any new casino on Indian trust land.  *Id.* at 10.  They were "third-party beneficiaries" of the compacts to take land into trust for gaming purposes.  *Id.* at 10.  So these tribes were directly impacted by the challenged agency action to take land into trust.  Further, the Michigan state-law hurdles to opening the casino were far less arduous—and thus the injury-in-fact less attenuated—than those in California.  *Compare id.* at 11 ("[T]he Department's decision likely represents the last significant hurdle preventing the Tribe from opening new gaming facilities . . . .") *with Yocha Dehe*, 3 F.4th at 431 (listing four remaining barriers to a casino opening).  "[I]f the Court ordered the Department to reverse its decision," the Ste. Marie tribe would "be free to open casinos on the parcels" and that "would lead to a loss of gaming dollars for the Intervenor Tribes."  *Id.*  So the Ste. Marie Tribe's injury-in-fact met the imminence requirement in a way that the Patwin tribes' harm does not.  The tribes point out that *Sault Ste. Marie* allowed non-tribal casinos to intervene even though they only

experienced economic harm and were not directly regulated.  Patwin Reply Mot. Intervene, ECF
No. 36, at 9; 331 F.R.D. at 11–12.  But again, the casinos' injury-in-fact was less attenuated
because the agency action was the "last significant hurdle" before gaming facilities opened.  *Id.*
Imminence was and remains the issue.[4]

Next, the Patwin tribes invoke *Connecticut v. Department of Interior* to show that the
"competitor-standing doctrine" applies.  Patwin Mot. Intervene at 15; 344 F. Supp. 3d 279, 298–
99 (D.D.C. 2018).  But this case does more harm than good to their cause.  There, a tribe had
standing to intervene in an action involving proposed amendments to gaming regulations that
would allow competitor tribes to build a casino.  344 F. Supp. 3d at 298–99.  The district court's
standing analysis relied on the competitor-standing doctrine, which holds that "an economic
actor suffers an injury in fact when agencies lift regulatory restrictions on its competitors or
otherwise allow increased competition against it."  *Id.* (citing *Sherley v. Sebelius*, 610 F.3d 69,
72 (D.C. Cir. 2010)) (cleaned up).  So far, so good.

But the district court there, as in *Sault Ste. Marie*, emphasized that the challenged agency
action was "the only condition remaining to be fulfilled" before the competitor tribe could
operate its casino.  *Id.* at 299.  "In other words, if the Secretary is ordered to deem the
amendments approved, MGM's Springfield casino will face an imminent increase in competition
from the Tribes' casino less than twenty miles away; the core injury-in-fact underlying
competitor standing."  *Id.* (cleaned up).  The imminence requirement was two- or three-fold less
conditional than the situation here.  Requiring an imminent increase in competition is a feature,

---

[4] The Patwin tribes raise the specter that Scotts Valley Band could open a casino without the legal permission to
conduct gaming, which would create a more imminent injury for all intervenors.  Patwin Reply Mot. Intervene at 12.
But unlike in *Sault Ste. Marie*, the Scotts Valley Band has not alleged such an intent or a possibility under the
governing regulations here.  *Sault Ste. Marie*, 331 F.R.D. at 11.  The *Sault Ste. Marie* tribe already had a compact
with the state.  *Id.* at 10.

not a bug, of competitor-standing doctrine in the D.C. Circuit. *Sherley*, 610 F.3d at 73 ("[T]he basic requirement common to all our cases is that the complainant show an actual or imminent increase in competition, which increase we recognize will almost certainly cause an injury in fact." (cleaned up)). The Yocha Dehe tribes did not meet that requirement in 2021 and they still do not today.

The Patwin tribes lodge two final arguments that were not addressed in the previous litigation. First, they assert that while on remand—since the *Yocha Dehe* decision—the Department ignored their submitted evidence undermining the Scotts Valley Band's ancestral claim to the Vallejo parcel. Patwin Mot. Intervene at 16. For that reason, they say that they have suffered a new injury. *E.g.*, Patwin Reply Mot. Intervene at 14–15. The record reflects that the tribes' evidence was considered during the first round of litigation, but not on remand before the January 10 decision granting the land in trust and gaming eligibility. *Scotts Valley Band of Pomo Indians v. Dep't of Interior*, No. 19-cv-1544, Yocha Dehe Mot. Intervene, ECF No. 17-2, at 3, ¶ 3; January 10 Decision.[5] Allowing the Patwin tribes to participate here, they say, will "correct[] that error" by allowing them to be heard. Patwin Mot. Intervene at 16–17.

The Scotts Valley Band replies that the gaming eligibility determination does not require public comment, so there was no procedural injury at all. Scotts Valley Band Opp'n Patwin

---

[5] Letter from Wizipan Garriott, Principal Deputy Ass't Sec'y – Indian Affairs, U.S. Dep't of the Interior, to Hon. Shawn Davis, Chairman, Scotts Valley Band of Pomo Indians at 2-23 (Jan. 10, 2025), https://www.bia.gov/sites/default/files/media_document/scotts_valley_band_of_pomo_indians% 2C_january_10%2C_2025%2C_trust_acquisition_decision_letter.pdf ("January 10 Decision") ("We note that, in reconsidering the 2019 [land-in-trust decision] on remand, the Department neither solicited nor considered any additional evidentiary materials from outside parties."). The Court credits this version of the facts over the Scotts Valley Band's uncited assertion that the Department considered the Patwin tribes' evidence submitted on remand before issuing the January 2025 decision. Scotts Valley Band Opp'n Patwin Mot. Intervene at 16–17. As for the parties' dispute about whether the D.C. Circuit denied standing to Yocha Dehe because it could resubmit evidence on remand: It is both inapposite to this matter for the reasons elaborated above and it was irrelevant to the D.C. Circuit's reasoning in *Yocha Dehe*. 3 F.4th at 428–31; Reply Patwin Mot. Intervene at 13 n.5.

Mot. Intervene at 15.  The tribe is right that while other components of the process—like the land-in-trust decision and the National Environmental Policy Act review—allow public comment, the gaming eligibility does not.  *See Gaming on Trust Lands Acquired After October 17, 1988*, 73 Fed. Reg. 29,354, 29,361 (May 20, 2008).  So regardless of the public comment provisions governing other parts of the process, no comment guarantee covers the decision at issue today: gaming eligibility.  Scotts Valley Opp'n Patwin Mot. Intervene at 17 ("[T]o the extent Proposed Intervenors believe they were injured in connection with the trust acquisition or the NEPA review—each of which did allow for either tribal consultation or public comment— there is a proper venue for their claims [in separate litigation].").  The Patwin tribes' alleged procedural injury could not as a regulatory matter extend to this case.  More, even assuming the tribes had suffered an APA-based procedural injury, this is not enough to generate standing. "[B]are procedural violations, divorced from any concrete harm," do "not suffice for Article III standing."  *TransUnion*, 594 U.S. at 440; *see Tanner-Brown v. Haaland*, 105 F.4th 437, 444 (D.C. Cir. 2024) (assuming that the plaintiffs would be "successful in their claims" for standing analysis purposes).  And because there is no imminent injury-in-fact, the procedural violation has no hand to hold.

The intervening tribes anticipate this flaw, arguing that the mere increased risk of a competitor casino suffices as an injury-in-fact.  Patwin Mot. Intervene at 17 n.4.  But both cases they cite in support require that the challenged agency action directly regulate the parties for them to suffer injuries-in-fact.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 496–97 (2009) (rejecting standing for plaintiffs who had "suffered procedural injury" but who were not themselves "the object of the government action" challenged); *Am. Tunaboat Ass'n v. Ross*, 391 F. Supp. 3d 98, 108 (D.D.C. 2019) (finding standing for a party directly regulated by the agency

action).  But these tribes are not directly regulated by the Vallejo parcel decisions.  More, after *TransUnion*, it is unclear whether even direct regulation always would suffice for an injury-in-fact without more.  *Coal. for Humane Immigrant Rts. v. Department of Homeland Sec.*, — F. Supp. 3d —, 2025 WL 1078776, at *7 (D.D.C. Apr. 10, 2025) ("Plaintiffs have not shown how merely being subject to a regulation—without incurring some other injury—fits within this [*TransUnion*] framework.").

In response, the Patwin tribes argue that because the Department has explicitly invited their submissions while it reconsiders gaming eligibility, they have become the "objects" of the rescission and thus have standing.  Patwin Mot. Intervene at 17; Auburn Reply Mot. Intervene at 10.  Not so.  A discretionary comment invitation does not render a party directly regulated. *Klamath Water Users Ass'n v. FERC*, 534 F.3d 735, 740 (D.C. Cir. 2008) ("[P]etitioners do not have a right to seek court review of administrative proceedings merely because they participated in them.  Unlike an agency, our authority to hear a case is limited by the standing requirements of the United States Constitution.").  In support, the tribes invoke *Butte County v. Hogen*, which they say shows that failure to consider interested parties' comments violates the APA and thus harms that interested party for standing purposes.  613 F.3d 190, 194–95 (D.C. Cir. 2010).  But they misconstrue its holding.

*Butte County* involved a county contesting the Department's determination to take some of its land into trust for the benefit of a non-party Indian tribe.  *Id.*  The agency had issued a cursory denial when the county submitted comments on the trust decision.  *Id.*  The D.C. Circuit held that the agency's snippy denial violated the APA.  *Id.*  It thus stands for the unremarkable idea that when a party sues an agency for failing to adequately respond to its comments, that party has an injury that suffices for standing.  The case says nothing about invited non-parties

submitting comments, much less about whether a procedural harm resulting from treatment of those comments suffices for intervenor standing.

Second, the Patwin tribes allege that the Scotts Valley project would destroy their cultural sites on their Vallejo parcel easement. Patwin Mot. Intervene at 6. This argument is flawed both factually and legally. Legally, in the previous intervention litigation, the district and circuit courts did not find their cultural easement relevant to the standing inquiry even though the tribes raised the same issue. *Yocha Dehe*, 3 F.4th at 428–31; *Scotts Valley Band of Pomo Indians v. Dep't of Interior, et al.*, No. 19-cv-1544, Decl. of Anthony Roberts, ECF No. 17-2, at 4, ¶ 5; *Scotts Valley v. Dep't of Interior*, 633 F. Supp. 3d 132 (D.D.C. 2022). Rejecting the argument that cultural injury created standing was necessary to denying standing, so it is an implied holding. The tribes do not cite cases supporting their cultural-injury argument. Patwin Mot. Intervene at 15 (citing economic-injury cases); Patwin Reply Mot. Intervene at 8–9 (same). This Court cannot grant standing on grounds the Circuit previously rejected.

Factually, the Patwin's cultural site appears to have been acknowledged and protected by the federal government. The Patwin tribe's cultural easement has been named the CA-SOL-275 site. Patwin Reply Mot. Intervene at 10. The Bureau of Indian Affairs ("BIA") specifically provided for its protection while analyzing the "impact" of the Scotts Valley Casino project. Exhibit A, ECF No. 1-1 at 37. The BIA required that "[g]round-disturbing activities shall be monitored by a qualified archaeologist and Native American Tribal Monitor, particularly any activities that occur within 150 feet of the non-eligible prehistoric chert [stone] outcrop component of CA-SOL-275." *Id.* at 54. "In the event of any inadvertent discovery of prehistoric or historic archaeological resources during construction-related earth-moving activities, all work within 50 feet of the find shall be halted until a professional archaeologist . . . can assess the

13

significance of the find." *Id.* at 55.[6]  The Patwin tribes' assertion of "bulldoz[ing]" a cultural site thus seems tenuously connected with reality.  Patwin Mot. Intervene at 15.

The Patwin also have not carried their burden to show that they will suffer a diminution of rights to their cultural easement.  The Scotts Valley Band insists that federal statutes guard cultural resources across land transfers, including this one, and the Patwin tribes have offered no contradictory evidence besides conclusory statements that their cultural resources will be destroyed.  Scotts Valley Opp'n Patwin Mot. Intervene at 25–26; Patwin Reply Mot. Intervene at 10.  Again, the tribes cite no cases supporting cultural-injury standing, but on the Court's own search, standing for intervention may be defeated if cultural statutory or common-law rights continue despite a challenged land transfer.  *See Crow Creek Sioux Tribe v. Brownlee*, 331 F.3d 912, 915–18 (D.C. Cir. 2003) (holding that a tribe did not have standing to intervene when its statutory right to cultural resources clearly would continue after challenged land transfer); *cf. Cedar Point Nursery v. Hassid*, 594 U.S. 139, 155 (2021) (stating that a "true easement in gross under California law," the state law governing the easement in this case, would "burden" a "particular parcel of property" and be "transfer[able]").  Though the evidentiary landscape is not completely clear here, the Patwin tribes bear the burden.  *Yocha Dehe*, 3 F.4th at 430 ("[T]o intervene under Rule 24(a) [as of right], the movant must demonstrate that it has standing under Article III . . . .").  They have failed to show that their cultural easement will suffer harm factually, or that this fact is enough to generate standing legally.

---

[6] The parties seem to agree that CA-SOL 275 is not a "historic site" as the National Historic Preservation Act defines it.  Exhibit A, ECF No. 1-1 at 59; Scotts Valley Opp'n Patwin Mot. Intervene at 27–28 & n.14; Patwin Reply Mot. Intervene at 10.  But the Patwin tribes do not meaningfully contest that the NHPA will still guide cultural preservation of the CA-SOL-275 site in the specific ways the BIA enumerated in its report.  Exhibit A, ECF No. 1-1 at 67 (stating that the NHPA will "[d]etermin[e] compliance" with preservation of cultural resources found near the site).

The same analysis applies to the Auburn tribe's nearly identical arguments. *E.g.*, Auburn Mot. Intervene at 12 (advancing the same "significant benefit" argument as the Patwin tribes); Auburn Reply Mot. Intervene at 10–11 (asserting that it has a right to submit evidence that the agency violated). But two remaining issues are worth addressing. First, the Auburn tribe alleges another procedural injury of the agency failing to consult with it about the Scotts Valley Band's parcel, as it is allegedly required to do. Auburn Mot. Intervene at 15; Auburn Reply Mot. Intervene at 12; 40 C.F.R. § 1501.9. But it concedes that any alleged consultation violation would be a "procedural injury." *Id.* As discussed, that must accompany a more concrete harm to support standing. *Cf. Am. Tunaboat Ass'n*, 391 F. Supp. 3d at 108 (finding, pre-*TransUnion*, that an agency decision *directly* depriving a tribe of consultation rights generated standing when associated with compliance costs). If there was some type of additive effect from two procedural injuries instead of one, the tribe has cited no cases in support of that proposition. The tribe's second unique argument is a vague interest in the interpretation of the Indian Gaming Regulatory Act. *Id.* at 17–18. But it cites only this Court's case in *Sault Ste. Marie* for that proposition, which, remember, involves direct third-party beneficiaries that had a clear financial interest in the challenged action.

All three tribes thus fail to show that they will suffer an imminent injury-in-fact from the gaming-eligibility rescission or a reinstatement of the same. So they have not established the standing required to intervene as of right. The Court declines to address the other intervention-as-of-right factors.

## IV.

Move now to the standing question for GTL Properties. The company previously owned part of the Vallejo parcel. It seeks to intervene in support of Plaintiff because it stands to reap

15

proceeds from the Scotts Valley Band's prospective casino.  GTL Mot. Intervene, ECF No. 20-1, at 5–6.  For much the same reasons that the tribes are not imminently injured, GTL's injury is not redressable.  So it lacks standing to intervene as of right.[7]

First, a little more detail about the GTL contract with the Scotts Valley Band is in order.[8] GTL used to own 32 acres of the 160-acre Vallejo parcel.  GTL Mot. Intervene at 5–6.  It executed a sale agreement for the 32-acre portion that would transfer the land deed to the tribe if the Department of the Interior determined that the Vallejo parcel was the tribe's restored homeland that was eligible for gaming.  *Id.*  The parties signed in November 2024 in anticipation of the January 2025 determination in the Scotts Valley Band's favor.  *Id.*  The GTL parcel's deed was held in escrow until the January decision issued.  *Id.*  The deed transferred in January.  90 Fed. Reg. 3,906 (Jan. 15, 2025) (showing the federal government taking the 160 acres into trust).

---

[7] GTL makes the same *Little Sisters of the Poor* argument that the prospective intervenor tribes do.  GTL Mot. Intervene at 7; *see supra* note 3.  GTL, at this stage of the litigation, seeks the same relief as the Scotts Valley Band to reverse the March 27 rescission.  *Id.*  It does not assert any financial or contractual claims against the Scotts Valley Band.  *Id.*  So GTL likely does not "pursue[] relief that is broader than or different from the party invoking a court's jurisdiction."  *Little Sisters*, 591 U.S. at 674 n.6.  Still the Court will assess whether GTL has shown standing because *Yocha Dehe*, 3 F.4th at 428, assessed Article III jurisdiction for *defendant*-intervenors without analyzing their breadth of relief, and it did so after *Little Sisters*, despite the Supreme Court's suggestion that defendant-intervenors had a lesser standing burden than plaintiff-intervenors.  *See Farmer*, 2024 WL 5118193, at *2 n.2 (describing *Yocha Dehe* as a case "requir[ing] intervenors of right to demonstrate Article III standing regardless of whether they invoke the court's jurisdiction or seek relief different from that sought by the original parties").  *Yocha Dehe* confirms without citing the older line of D.C. Circuit precedent that has not been expressly overruled requiring standing for all intervenors as of right.  *Deutsche Bank Nat'l Tr. Co. v. FDIC*, 717 F.3d 189, 194 (D.C. Cir. 2013).  That case explicitly rejected the argument that defendant-intervenors need not show standing because the defendant does not invoke the court's jurisdiction.  *Id.*  This Court is loath to find *Deutsche Bank* abrogated when the D.C. Circuit did not so hold in *Yocha Dehe* after the potentially abrogating cases *Little Sisters* and *Virginia House of Delegates*.  *See supra* note 3.

[8] GTL Properties does not attach a copy of its agreement to its filings.  The Court thus takes GTL's alleged material terms as true, as it must at the pleading stage.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice [for standing], for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim."); *Yocha Dehe*, 3 F.4th at 430 (placing the burden on the movant to show standing).  But even on GTL's description of the terms, it does not have a redressable injury.

The contingencies for the sale and the payment were different. The sale was contingent on the Department's determination. GTL Mot. Intervene at 6; 25 U.S.C. § 2204 (governing the process of Indian tribes purchasing land placed in trust from private owners). But GTL agreed that it would only get paid after "gaming occurr[ed] at the Vallejo Parcel." *Id.* Because the Department rescinded its gaming eligibility determination in late March, GTL Properties now has transferred a deed for which it may not get paid. *Id.* Compounding the issue, the Government only rescinded the gaming eligibility, not the land-in-trust designation. *See* March 27 Letter. So the GTL sale contingency has occurred—the restored-lands designation stands—but the gaming rescission ensures that gaming does not "occur" on the land so that GTL does not get its proceeds for the sale. Tripling the issue, GTL also loaned the tribe money to buy the adjoining 128-acre parcel which, together with its original 32-acre one, created the 160-acre package. *Id.* at 9. That loan would be paid back just as the sale would be—from proceeds "once the Tribe generates revenues from gaming on the Vallejo Parcel." *Id.* at 6.

GTL Properties' injury is not redressable by this proceeding. GTL must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Sierra Club v. Jewell*, 764 F.3d 1, 5 (D.C. Cir. 2014). Even if the gaming eligibility were to be reinstated, there are still several layers of highly discretionary government decisions that stand between GTL and its payout—and there is no guarantee that any of those decisions would go GTL's way. Some of these steps can be, and have been, legally disputed, as discussed above. *See also, e.g.*, *Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1030 (9th Cir. 2022) ("[A]fter nearly five years of formal negotiations with the State [over a tribal-state gaming compact], the plaintiff Tribes had seen enough."). For the same reasons that

the tribes' injuries are attenuated, GTL Properties' delayed-or-canceled payment injury is not "likely" redressable.

The D.C. Circuit has held similarly when two developers had even a greater expectation of receiving payment after a discretionary government decision. *Miami Bldg. & Const. Trades Council, AFL/CIO v. Sec'y of Def.*, 493 F.3d 201, 206 (D.C. Cir. 2007). In *Miami Building*, two developers had contracted with Miami-Dade County to build an airport on a tract of land that the Air Force was planning to "dispose of." *Id.* at 202. The Air Force had approved the airport pending the federal government's approval of the County's application. *Id.* at 202–03. While the County drafted its application, it entered a conditional lease with the Air Force for the parcel that expressly did "not constitute a commitment by the Government as to the disposal of the Leased Premises . . . to the Lessee or any agency or instrumentality thereof, or to any sublessee." *Id.* at 203. Miami-Dade meanwhile signed a lease with two developers agreeing to lease the property to them for an airport and split the revenue with the County. *Id.* That lease would "not be effective" until the County acquired the property from the federal government. *Id.* After a few years of consideration, the government changed its mind about the airport. A supplemental environmental assessment persuaded the Air Force that the property should not be used for airport purposes. *Id.* at 203–04. The developers challenged the Air Force's decision to prepare another environmental report. *Id.* at 204.

The D.C. Circuit held that the developers did not have standing to challenge the decision because "courts have been loath to find standing when redress depends largely on policy decisions yet to be made by government officials." *Id.* at 205. After all, a "favorable decision in such a case depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control

or predict." *Id.* (cleaned up). Even if the Air Force were forced to grant the land to Miami-Dade for airport purposes, the "policy decision" about whether to "reverse course" and build something else was a decision "only Miami-Dade [could] make." *Id.* at 206. In such a situation, it becomes the party's burden to show factually that choices in its favor "have been or will be made in such a manner as to produce causation and permit redressability." *Id.* at 205. And the developers in that case had not done so. The plaintiffs' "disappointment at having invested—and perhaps lost—time and money in the proposed project, without more, [was] not enough to establish standing." *Id.* at 206 (cleaned up).

Here, as in *Miami Building*, GTL has not shown that restoring gaming eligibility will ensure that a casino is built on the parcel to generate proceeds for its sale and loan. This case involves yet three more discretionary government decisions from both state and federal regimes than *Miami Building* did: GTL has not shown that California is likely to reach a finally negotiated gaming compact with the tribe, or that the federal government is likely to approve the compact they negotiate, or that the federal government also will approve the tribe's management contract. Gov't Opp'n GTL Mot. Intervene, ECF No. 30, at 8, 9 n.3; *Yocha Dehe*, 3 F.4th at 431. The statute governing tribal-state compacts requires only "good faith" negotiation, not reaching a mutually amenable agreement. 25 U.S.C. § 2710(d)(3)(A). If the developers in *Miami Building* did not have a redressable injury, GTL certainly does not.

GTL's argument could be framed as asserting a "contingent legal right" to the proceeds from its real property sale. But the *Miami Building* panel rejected this precise argument in a nearly identical circumstance. *Miami Bldg.*, 493 F.3d at 206. There, the developers' contract "expressly provid[ed]" that its terms would not be effective until the County obtained the property from the federal government. *Id.* So, the panel reasoned, the "contingent legal right"

also wouldn't be effective until that time—if it "[]ever occur[red]." *Id.*  So "even assuming the contingent legal right theory could support redressability in the proper case—an issue [the Court did] not decide—this is not that case." *Id.*

And neither is this one.  Even if GTL had a contingent legal right, it similarly is expressly contingent upon an event that is not the government decision at issue here.  Even if the federal government had to re-grant gaming eligibility, the Scotts Valley Band still must obtain three layers of state and federal government permissions before building a casino.  GTL lacks the "legal right to compel" the relevant government entities to allow gaming on the Vallejo parcel, for the reasons described above.

GTL's predicament is distinguishable from *Teton Historic Aviation Foundation*, where a government contractor "marshalled enough evidence" that, "in light of the [agency's] past decisions and the incentives that w[ould] shape its choices in the future," there was a "substantial likelihood of redress."  785 F.3d at 726 (distinguishing *Miami Building* on this basis).  The D.C. Circuit there characterized the redressability inquiry as a spectrum rather than a bright line; even if there is a government-discretionary decision standing between the plaintiff and relief, a party can shoulder that burden through evidence showing "more than speculation but less than certainty" that the government action will move in its favor.  *Id.* at 727.  Redressability does not require "an inescapable obligation" that the defendant "act as the plaintiff desire[s]."  *Id.*

But again, the *Teton Historic* plaintiff carried that weight by discussing the agency's financial incentives and winning a concession at argument that a third-party would act as the plaintiff desired.  *Id.* at 727–28; *cf. Klamath Water Users Ass'n v. FERC*, 534 F.3d 735, 740 (D.C. Cir. 2008) (finding no standing where the agency's financial incentives counseled against the petitioner, who proffered no evidence to the contrary).  GTL has not engaged with this

caselaw or proffered the evidence it must.  It only suggests that the gaming rescission decision is a "necessary first step" to redressability.  GTL Reply Mot. Intervene at 12.  In contrast, the Department has convincingly suggested that the state compact negotiations with California may be long, arduous, and uncertain.  Gov't Opp'n GTL Mot. Intervene at 8.  This is the reason that *Fund for Animals* also fails to assist GTL.  GTL Reply Mot. Intervene at 9–10.  There, the intervenor showed that the "threatened loss of tourist dollars" would "likely" occur, and that "a decision favorable to the [plaintiff] would prevent that loss from occurring."  *Fund for Animals*, 322 F.3d at 730, 733.

GTL makes two additional clever but unsuccessful bids for redressability.  First, it argues that if its injury is not redressable, neither is the main plaintiff's, the Scotts Valley Band.  GTL Reply Mot. Intervene at 10.  Both injuries will not be healed absent layers of discretionary government decisions.  *Id.*  But the Scotts Valley Band's injuries do not rest on losing money from the casino, at least facially.  Its three counts are APA, statutory, and Due Process claims that rest on whether the rescission was procedurally proper.  Compl., ECF No. 1, at 13–14.  The Scotts Valley Band's alleged injuries are thus redressable with a procedurally appropriate rescission or other similar cure.  They do not rest on restoring the gaming license and eventually generating income.  GTL, on the other hand, must receive money to be made whole.  GTL Reply Mot. Intervene at 6–7.  This principle also distinguishes GTL's older precedents finding standing for "likely" redressable injuries.  *Id.* at 12 (citing *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 270, 273 (D.C. Cir. 1988), *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1292 (D.C. Cir. 1980)).

Second, GTL says that the entire *Yocha Dehe* case is distinguishable because it rested on the idea that the tribe's property was not the direct subject of the agency action.  GTL Reply

21

Mot. Intervene at 11.  The Court disagrees.  Factually, the deed has transferred from GTL to the federal government, so its land is technically not the direct subject.  *Id.* at 6.  Legally, *Yocha Dehe* explicitly said that direct regulation was unnecessary to standing.  3 F.4th at 431. Indirectly regulated parties, as in *Teton Historic*, facing a discretionary government decision between them and redressability still may shoulder their standing burden by showing that it is "likely" that the decision will go their way.  785 F.3d at 727–28.  But GTL has not.

"Because [this Court] agree[s] with [the agency] that [GTL] has failed to demonstrate redressability, [the Court] do[es] not address the other standing requirements."  *Klamath Water Users Ass'n*, 534 F.3d at 739.  Without standing, the Court need not address the other requirements for intervention as of right.

## V.

Though the first path to intervention is foreclosed, the Court considers whether any of these parties may use the second path: permissive intervention.  Recall that parties must show (1) an independent ground for subject-matter jurisdiction; (2) a timely motion; and (3) a common question of law or fact with the main action.  *See supra* Section II.  Further, this Court must consider whether permissive intervention would unduly delay, prejudice, or complicate the proceeding.  *Id.*

All parties have made timely motions to intervene and they share common questions of fact via concern for the Vallejo parcel.  All also have pleaded federal question jurisdiction.  28 U.S.C. §§ 1331, 1362.  It is unsettled whether permissive intervenors must show standing in the D.C. Circuit as part of their jurisdictional showing.  *In re Endangered Species Act Section 4 Deadline Litig. – MDL No. 2165*, 704 F.3d 972, 980 (D.C. Cir. 2013); *Deutsche Bank Nat'l Tr. Co. v. FDIC*, 717 F.3d 189, 195–96 (D.C. Cir. 2013) (Silberman, J., concurring) (arguing that

failing to require standing for permissive intervention would be "intolerable at the district court level"). Of course, if these prospective intervenors must have standing, they failed to make the requisite showing.

Even if standing is unnecessary, this Court exercises its "inherent[] discretion[]" to decline permission for all four intervenors. *Sault Ste. Marie Tribe of Chippewa Indians*, 331 F.R.D. at 9. Their presence would not "significantly contribute" to the "just and equitable adjudication of the legal question presented" because they would overcomplicate the case with peripheral issues. *Ctr. Bio. Diversity v. EPA*, 274 F.R.D. 305, 313 (D.D.C. 2011). The tribes, as discussed, claim their own procedural and economic injuries to generate standing; these are irrelevant to the claims that Scotts Valley lodges. *See supra* Part III.[9] Contrary to the Patwin tribes' assertion, the central issue is *not* whether the Department will consider "*their* evidence." Patwin Mot. Intervene at 23. It is whether the Department properly rescinded its gaming eligibility designation for the Vallejo parcel that was and still is held in trust for the Scotts Valley Band's benefit. For its part, GTL Properties seeks to vindicate a contractual arrangement tangential to the gaming rescission at hand. *See supra* Part IV. Its argument that this APA case will not involve additional discovery does not save the Court from "extraneous motions practice." GTL Reply Mot. Intervene at 14–15. Above all, the intervenors would balloon the number of parties in the case from two to five or six, depending on whether the two Patwin tribes keep expressing aligned interests. *Cf. Cooper v. Newsom*, 13 F.4th 857, 868–69 (9th Cir. 2021) (finding that a district judge exercised discretion properly when denying intervention that could

---

[9] While the Court has recognized that "Indian tribes' participation in litigation critical to their welfare should not be discouraged," as discussed, their injuries are not imminent here. *Sault Ste. Marie Tribe of Chippewa Indians*, 331 F.R.D. at 14. It is hard to discern how a speculative injury would be critical to a tribe's welfare.

complicate and "delay the already long-drawn-out litigation, particularly in light of the prospect" that many other parties may have wanted to intervene).

All of these factors would unduly delay consideration here by tangling a web of unnecessary legal problems. The Court "must consider" "delay or prejudice" to the original parties' adjudication. Fed. R. Civ. P. 24(b)(3). Nearly tripling the number of parties involved and bloating the briefing with layers of tangential issues would do just that. These concerns weigh particularly heavily here, given Scott Valley's pending emergency motion for injunctive relief and the Department's understandable claim that it would struggle to keep to the expedited brief schedule should additional parties be added. Gov't Opp'n GTL Mot. Intervene at 13, n.5. More, the intervenor tribes have filed related cases and they will have their turn to raise concerns in their own cases. For now, fairness to the existing parties in this case counsels against more chefs in the kitchen. The proposed intervenors are, however, welcome to file amicus briefs.

*    *    *

For all these reasons, Proposed Intervenors' [15, 16, 20] Motions to Intervene are **DENIED**. Amicus briefs supporting the Government's position must be filed by April 25, 2025, amicus briefs supporting Plaintiff must be filed by May 5.

**SO ORDERED**.

                                               /s/

Dated: April 23, 2025                     TREVOR N. McFADDEN, U.S.D.J.