UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SCOTTS VALLEY BAND OF POMO INDIANS**, <br><br> Plaintiff, <br><br> v. <br><br> **DOUGLAS BURGUM**, *et al.*, <br><br> Defendants. | Case No. 1:25-cv-00958 (TNM) |

## MEMORANDUM ORDER

    The Scotts Valley Pomo Band of Indians asks this Court to immediately stop the Department of Interior from reconsidering a recent decision. In January, the Department had granted the Band's requests to take land into trust on its behalf in Vallejo, California, and to remove federal gaming prohibitions there. The Band started preparing a casino project. Then, in late March, the Department told the tribe that it was reconsidering its decision about gaming on the Vallejo land. While it reconsiders, the agency told the Band not to rely on the gaming determination at all. The tribe says, among other things, that the agency's action was unreasonable and that it wreaks irreparable harm on its casino preparations.

    The Court declines to stop the agency process while this case is pending. The tribe bears a heavy burden to show that any harms it could experience during this litigation will be irreparable. It claims both monetary and sovereignty harms, but neither meets the requisite standard. The financial harms are too conclusory to show great and certain effects on tribal programs. And the tribe's sovereignty arguments are forfeited; even if they had not been, these harms are neither tangible nor imminent.

I.

The Band has been trying to build a casino on the Vallejo parcel for nearly a decade. The tribe had long been landless after a federal statute terminated their reservation in the mid-twentieth century. Pl. Mot. Preliminary Injunction, ECF No. 3-1, at 11. In 2016, the tribe asked the Department to designate the Vallejo parcel as its "restored homeland," eligible for gaming. Am. Compl., ECF No. 12 ¶ 10; 25 U.S.C. § 2719(b)(1)(B)(iii). The agency declined because the tribe had not shown "significant historical connection" to the site. *See Scotts Valley Band of Pomo Indians v. Dep't of Interior*, 633 F. Supp. 3d 132, 139 (D.D.C. 2022); Am. Compl. ¶¶ 19–20. The tribe appealed that denial and, in 2022, won an order requiring the agency to reconsider. *Scotts Valley Band*, 633 F. Supp. 3d at 136. After reconsidering, the agency changed its mind. On January 10, 2025, the Department granted the tribe's request to take the land into trust. Pl. Ex. A, ECF No. 1-1 at 2, 23–24. Title transferred to the United States, to be held in trust for the tribe. Pl. Mot. PI at 12–13. The Department also designated the parcel as restored homeland, making it eligible for gaming under federal law. 25 U.S.C. § 2719(b)(1)(B)(iii).

The Scotts Valley Band started the wheels in motion for a gaming enterprise. Indeed, the tribe took a few steps before January 10, including signing contracts with the parcel's previous private owner and the City of Vallejo. *Scotts Valley Band of Pomo Indians v. Burgum*, 2025 WL 1178598, at *8 (D.D.C. Apr. 23, 2025) (private contract); Amicus Br. of Yocha Dehe *et al.*, ECF No. 55-1, at 20 (City of Vallejo contract); Amicus Yocha Dehe Exs. 1–4, ECF Nos. 55-3, 55-4, 55-5, & 55-6 (City of Vallejo contract).[1] After January 10, the Band moved toward gaining full legal approval. It submitted a gaming ordinance to the National Indian Gaming Commission. Second Decl. of Shawn Davis, ECF No. 63-2 ¶ 5; 25 U.S.C. § 2710(b)(1)(B). After revision, the

---

[1] The Court acknowledges the helpful briefing of all amici here.

ordinance was approved in late March, just days before the Department suspended the gaming determination. Am. Compl. ¶ 25; First Decl. of Shawn Davis, ECF No. 3-2 ¶ 15; Letter from Sharon M. Avery, Acting Chairwoman of the Nat'l Indian Gaming Comm. to Shawn Davis, Chairman of the Scotts Valley Band of Pomo Indians (Mar. 25, 2025).[2] The Band began negotiating with California about a tribal-state compact that would authorize gaming on the Vallejo parcel under state law. Second Davis Decl. ¶ 7.

The tribe also started dealings with private parties. It entered contracts for "infrastructure work related to water and wastewater systems, environmental analysis, and additional technical studies." First Davis Decl. ¶ 12. "Many of these agreements were executed or finalized prior to [the federal suspension] and obligated the Tribe to ongoing performance and payment." Second Davis Decl. ¶ 11. The Band worked with financial advisors to calculate projected revenues for the casino which, they predicted, would secure financing to construct a "tribal administration building and much needed tribal member housing" on the parcel as well. Decl. of Branden Martin, ECF No. 63-1, at ¶ 4. In total, the pre- and post-January 10 contracts would eventually require nearly $2 million in payments. Second Davis Decl. ¶ 13.

In late March, neighboring tribes sued the Department challenging its January decision to take the land into trust for the benefit of Scotts Valley Band. *See Yocha Dehe Wintun Nation, et al. v. Dep't of Interior*, No. 25-cv-00867, Compl., ECF No. 1 (D.D.C. Mar. 24, 2025); *United Auburn Indian Comm. v. Dep't of Interior*, No. 25-cv-00873, Compl., ECF No. 1 (D.D.C. Mar. 24, 2025); *Lytton Rancheria of Cal. v. Dep't of Interior*, No. 25-cv-01088, Compl., ECF No. 1 (D.D.C. Apr. 10, 2025). At least one tribe in each suit operates a casino near the Vallejo site.

---

[2] https://www.nigc.gov/images/uploads/gamingordinances/20250325_Scotts_Valley_Band_of_Pomo_Indians_Amend_Gam_Ord.pdf.

*Scotts Valley Band of Pomo Indians*, 2025 WL 1178598, at *1 (discussing the Yocha Dehe and Auburn Indian casinos); *Lytton Rancheria*, No. 25-cv-01088, Compl. ¶¶ 50–52.

Days after the neighboring tribes sued, on March 27, the Department suspended the Scotts Valley Band's gaming eligibility determination. Compl., Ex. B, ECF No. 1-2 at 2 (March 27 Decision). The suspension stated that the "Trust Determination still stands and the Vallejo Site remains in trust." *Id.* But the Department was "temporarily rescinding the Gaming Eligibility Determination for reconsideration." *Id.* The Secretary was "concerned that the Department did not consider additional evidence submitted after the 2022 Remand." *Id.* "During the pendency of this reconsideration," the Department advised that "neither the Tribe nor any other entity or person should rely on the Gaming Eligibility Determination." *Id.*

After the suspension, the Scotts Valley Band's plans went awry. California halted their state-tribal compact negotiations because it "remain[ed] unconvinced that the State currently has a duty to negotiate" under the Indian Gaming Regulatory Act. Pl. Supp. Memo., Ex. G, ECF No. 60-8 at 2; Second Davis Decl. ¶ 8. The Band has paid $454,125 in project-related expenditures since March 27, even though the gaming eligibility is suspended, because it had committed to contracts and other payments that, if missed, it says would undermine "project viability."[3] Second Davis Decl. ¶ 12–13.

The tribe now asks this Court to preliminarily enjoin the gaming eligibility suspension because it is suffering irreparable harm to its sovereignty and financial interests. The motion is

---

[3] The tribe claims that these "actions were not discretionary investments made in disregard of the Department's rescission, but rather good-faith steps to mitigate harm while preserving the Tribe's legal and financial position." *Id.*

ripe for consideration after briefing and argument. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.[4]

## II.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008). The latter two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Courts grant preliminary injunctions sparingly and only when the movant "*by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis original).

The D.C. Circuit "has said time and again that the degree of proof required for irreparable harm is high, and that a failure to surmount it provides grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019) (cleaned up). "The injury must be both certain and great; it must be actual and not theoretical and of such imminence that there is a clear and present need for equitable relief." *Id.* (alteration accepted). Plaintiffs must show that they are "likely to suffer irreparable harm *before a decision on the merits can be rendered*." *Winter*, 555 U.S. at 22 (emphasis added).

---

[4] The parties question whether the agency's action was "final" as required under the Administrative Procedure Act ("APA"). Though the D.C. Circuit has "loosely" called the requirement jurisdictional in the past, it has since clarified that the "requirement of final agency action is *not* jurisdictional." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 184 (D.C. Cir. 2006) (emphasis original); *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017) ("[I]n a departure from earlier cases, we have several times recognized that the finality requirement and adequate remedy bar of § 704 determine whether there is a cause of action under the APA, not whether there is federal subject matter jurisdiction."). Instead, district courts have original jurisdiction over APA claims under the general federal-question statute. *Trudeau*, 456 F.3d at 185. Because the finality requirement is not jurisdictional, the Court need not consider it before the merits of the preliminary injunction. *Cf. Reynolds v. Sheet Metal Workers, Loc. 102*, 702 F.2d 221, 223 (D.C. Cir. 1981) ("Federal courts are courts of limited jurisdiction, and are obliged always to ascertain whether they have subject matter jurisdiction over the litigation" at the preliminary injunction posture).

5

III.

The Court turns first to irreparable harm. The tribe's alleged harms fall into two major categories: monetary and sovereignty harms. Pl. Mot. PI at 39–40; Pl. Reply Br., ECF No. 63, at 26–31.

A.

"Where the injuries alleged are purely financial or economic, the barrier to proving irreparable injury is higher still, for it is well settled that economic loss does not, in and of itself, constitute irreparable harm." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (cleaned up). "Financial injury is only irreparable where no adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Id.* The D.C. Circuit has recognized such irreparable financial injury "only where the loss threatens the very existence of the movant's business." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Another court recently applied these principles to tribes by requiring them to show that "immediate impacts on tribal programs and services will be certain and great." *See Cow Creek Band of Umpqua Tribe of Indians v. Dep't of Interior*, 2025 WL 548316, at *4 (D.D.C. Feb. 19, 2025). This analysis avoids treating tribes as "purely private enterprises" when applying the *Wisconsin Gas* irreparable harm principle. *Id.*

The tribe has not made a showing of irreparable monetary losses. Reading its factual allegations generously, it has described the following harms: The Band has "authorized" spending nearly $2 million in signed contracts, and since the March 27 decision, it has incurred $454,125 in project-related expenditures. First Davis Decl. ¶¶ 12–13; Second Davis Decl. ¶ 13. The Chairman said that the tribe has "limited economic opportunities," so it "cannot afford to have [its] economic development efforts derailed." First Davis Decl. ¶ 22. And a financial

advisor predicted that "it is unlikely that the Tribe will be able to secure financing for [a tribal administration building and much needed tribal member housing] without the anticipated revenues from the gaming enterprise." Martin Decl., ECF No. 63-1, ¶¶ 4–5.

These injuries are too conclusory to show irreparable harm. The declarations only provide the tribe's total disbursement since March 27 and the sum of overall authorized future contractual payments. First Davis Decl. ¶¶ 12–13; Second Davis Decl. ¶ 13. The tribe has disclaimed the need to file copies of its contracts, resting instead on "sworn declarations." Pl. Reply Br. at 29–30. The Court does not demand copies of each signed contract, but it will hold the tribe to its evidentiary burden to prove irreparable harm. The declarations do not suffice on that front. These numbers do not show that the tribe will suffer irreparable harm before the Court issues a merits decision later this year. They do not indicate key details like whether the payment structures include up-front deposits without follow-ups due for some time, or whether the payments could be slowed while the Department reconsiders, or whether the tribe actually risks breach of any of these contracts.

More, some of these unspecified contracts likely do not qualify as monetary harms. The Department points out that at least two of the tribe's contracts were signed before January, when the land-in-trust and gaming eligibility determinations issued. Gov't Opp. Br., ECF No. 47, at 28. Any contractual payments under such early-signed contracts, the Department says, should not factor into the tribe's monetary harm. *Id.*; Amicus Br. Yocha Dehe *et al.*, ECF No. 57, at 13–14. In other words, if the contracts did not rely on the January decision, then they also are not harmed by the Department suspending part of it. Gov't Opp. Br. at 28. The Court agrees. But the tribe has not provided enough detail for the Court to determine how much, if any, monetary harm is implicated. The declarations do not describe the contracts in detail, much less their

7

execution dates. Pl. Reply Br. at 29–30. In sum, the Court *would* subtract any contracts signed before January that were not expressly contingent on the land-in-trust determination, but the tribe's irreparable harm showing is too conclusory to do so.

Where amici describe two pre-January contracts, those agreements are irrelevant to the tribe's monetary harm. Amicus GTL Properties detailed its November contract with the Band. Under the contract, GTL's land deed only transferred after the Department made a land-in-trust designation, so that document *was* signed in reliance on the January decision. *Scotts Valley Band of Pomo Indians*, 2025 WL 1178598, at *7–8. But the GTL contract did not require payment from the Band until it built the casino on the land; this unique contract structure motivated GTL to seek intervention because the Band is not paying anything under the contract even though the land deed already transferred. GTL Mot. Intervene, ECF No. 20-4, at 6. So this contract is not imposing monetary harms on the tribe now.

The Band signed the other pre-January contract with the City of Vallejo. Amicus Yocha Dehe Exs. 1–4, ECF Nos. 55-3, 55-4, 55-5, & 55-6. Major components of that contract also hinged on the January decision. Yocha Dehe Ex. 1, ECF No. 55-3, at 2–4 (stating that the City and tribe would negotiate on environmental issues if the "Project Site is taken into trust" and on emergency services and public utilities "if the Application to the Department of the Interior is approved"). But again, that contract was a pact to negotiate an Intergovernmental Agreement in the future, so the filed portions do not appear to require any monetary commitment from either the City or the tribe upon signature. *E.g.*, *id.* at 5 (agreeing to *negotiate and enter* a Reimbursement Agreement in the future). In sum, both of the pre-January contracts in the record before the Court are irrelevant to monetary harm, though they were contingent on the January decision.

The tribe also has not shown that these conclusory monetary losses will have "immediate impacts on tribal programs and services [that] will be certain and great." *Cow Creek Band*, 2025 WL 548316, at *4. Another court in this district found that far more detailed tribal affidavits were too conclusory. *See Cow Creek Band*, 2025 WL 548316, at *4. The documents there (1) named tribal government departments that would be impacted by "budget cuts" without describing how they would be impacted, (2) listed other programs that would "likely" be cut, and (3) stated that education would be cut "substantially" without estimating how many students would be impacted and when. *Id.* Here, the tribe has only stated that because it has "limited economic opportunities, [it] cannot afford to have [its] economic development efforts derailed." First Davis Decl. ¶ 22. The Band also speculates that it may encounter difficulty finding other financing for housing. Martin Decl. ¶¶ 4–5. These statements fall short of the detail required to show "immediate" impacts on tribal programs.

Because the harms are conclusory, the tribe has not shown that its losses are "great" enough to surmount the irreparable harm bar. *Wis. Gas Co.*, 758 F.2d at 674. Even if all $2 million in anticipated contract payments were due before the likely end of this litigation—and the tribe has made no such showing—the Band has not shown that this expenditure would "threaten[] the very existence of the movant's business" or similarly compromise tribal services and programs. *Wis. Gas Co.*, 758 F.2d at 674. The record before the Court shows only that the tribe incurred around $450,000 in contract payments between March 28th and May 19th, with no showing of how this impacts tribal programs, or whether such a continued expenditure for the next few months will have an "immediate," threatening effect on the tribe's function. Second Davis Decl. ¶ 13. This simply does not suffice to show irreparable harm.

9

Finally, the Band alleges that its monetary losses are irreparable because sovereign immunity precludes their recovery from the agency. Pl. Reply Br. at 28–29. Courts in this district have generally rejected the idea that "*any* damages in a suit against a defendant with sovereign immunity are irreparable *per se*." *Air Transport Ass'n of Am., Inc. v. Export-Import Bank of U.S.*, 840 F. Supp. 2d 327, 335–36 (D.D.C. 2012) (collecting cases). Even the case that the tribe cites in support of its sovereign-immunity proposition agrees: "Even where unrecoverable economic harm exists, courts in this district have required the economic harm faced to be serious in terms of its effect on the plaintiff." *Perkins Coie LLP v. Dep't of Just.*, — F. Supp. 3d —, 2025 WL 1276857, at *48 (D.D.C. May 2, 2025). Rather than adopt a per se rule, courts have simply followed the same *Wisconsin Gas* standard recited above. The loss must "threaten[] the very existence of the movant's business" or have a similarly demonstrated effect on Indian tribes. *Air Transport*, 840 F. Supp. 2d at 336. The tribe fails this standard.

The Band invokes a recent Supreme Court case to undermine this district precedent. *See Ohio v. Env't Prot. Agency*, 603 U.S. 279, 291–92 (2024). There, the Court said that because "each side ha[d] strong arguments about the harms they face[d]," it would decide consolidated stay requests based on the merits. *Id.* In dicta, it discussed the appellants' strong arguments for irreparable harm, including a group of states' assertion that they would incur "hundreds of millions, if not billions of dollars" in damages. *Id.* (cleaned up). "These costs, the applicants note, are nonrecoverable." *Id.* (cleaned up). This is the sentence on which the tribe's argument rests. Pl. Reply Br. at 29.

But the Court did not attribute those damages' "nonrecoverable" nature to sovereign immunity specifically. *Id.* For the proposition, the Court cited two cases that discussed (1) pre-enforcement constitutional challenges, which the opinion says should exist so that parties did not

10

have to endure "enormous and severe penalties" before accessing courts, and (2) rent payments that would be nonrecoverable for landlords during COVID. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021) (per curiam). This Court declines to read this stray sentence resting on non-sovereign immunity precedent to lower the monetary harm standard in the D.C. Circuit in cases against defendants with sovereign immunity. There also is no basis for thinking that the sentence creates a narrow rule governing only other sovereigns suing defendants with sovereign immunity. *Ohio*, 603 U.S. at 292 (discussing approvingly the states' argument that the federal rule infringed their sovereign interests). Rather, if we read tea leaves about *Ohio*'s reliance on *Thunder Basin*, the citation might suggest the opposite: That damages still must be "enormous and severe." *Thunder Basin*, 510 U.S. at 221.

In sum, the tribe has not shown irreparable monetary harm that meets the requisite high bar.

**B.**

Next, the tribe contends that the Department's suspension of gaming eligibility "substantially infringes" on its sovereign authority over the Vallejo Site still held in trust for its benefit. Pl. Mot. PI at 16. But the Band's arguments on sovereignty are forfeited and, even if they are not, the harm is not irreparable.

**1.**

In its reply brief, the Band asserts that the March 27 gaming-eligibility suspension triggered criminal penalties for gaming on the Vallejo site that did not exist on March 25. Pl. Reply Br. at 27. But these arguments are forfeited. Proffering a "conclusory assertion" in an opening brief that "does not fully explain the nature of the alleged violations" "fail[s] to preserve

11

the claim." *Abdullah v. Obama*, 753 F.3d 193, 199–200 (D.C. Cir. 2014). The tribe's opening brief said only: "The Secretary's action . . . changes the applicable substantive gaming laws on the Vallejo Site from the laws of [the tribe] to the laws of the State of California." Pl. Mot. PI at 16 (citing 18 U.S.C. § 1166). It makes no mention at all of this argument in its irreparable harm section. *Id.* at 39-40. The tribe does not "fully explain" any "alleged violations" to its sovereignty until the reply brief; specifically, it does not even *allude* to what types of gaming might have been affected and in what contexts criminal penalties might be triggered. *Cf.* Pl. Reply Br. at 27 (advancing these arguments). Such a "skeletal" argument "leav[es] the court to do counsel's work." *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007). And that is not acceptable.

## 2.

Even if the arguments were not forfeited, they fail to meet the irreparable harm standard. Most effects from the legal shift will be delayed so that any harm is not "imminent," and any sovereignty change has not produced the type of "actual," "tangible" harm that the D.C. Circuit requires. *Olu-Cole*, 930 F.3d at 529; *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 298–99 (D.C. Cir. 2006).

First, turn to imminence. The Band says that because the federal gaming eligibility has been suspended, California's criminal gaming laws now apply to the tribe's land in trust. Pl. Mot. PI at 16. This legal shift, the Band contends, imposes irreparable harm because it impinges on tribal sovereignty to regulate gaming on its own lands. *Id.* But any effects from the change in governing law on the Vallejo site would not be "likely" or "imminent" before the end of merits briefing. There would have been unavoidable time delays in the tribe gaining full regulatory power over the Vallejo site. Indeed, the Band emphasized how "many steps removed" its casino

project was when it opposed fellow tribes' intervention here. Scotts Valley Opp. Mot. Intervene, ECF No. 31, at 24–25. The Band cannot claim to be buried in red tape to prevent its competitors intervening but then wave that tape aside when it serves its litigation purposes.

To be more specific: The legal delays are different for the two types of gaming that the Indian Gaming Regulatory Act governs. For many traditional casino games, like blackjack, tribes must negotiate a Tribal-State compact before they may host them on Indian land. 25 U.S.C. § 2710(d)(1)(C); *id.* § 2703(7)–(8) (defining Class II and Class III gaming under IGRA with many traditional casino games falling into Class III). That compact, all parties agree, had not been fully negotiated before the suspension. Gov't Opp. Br. at 20; Hr'g Tr. at 5–8. So for this category of casino games, the tribe had not even gained sovereignty to enforce its laws on the Vallejo site before the suspension. It had, at most, contingent authority pending the tribal-state compact outcome.

As this Court has noted, those compact negotiations are far from routine; they can stretch on interminably and fail to reach a deal. *Scotts Valley Band of Pomo Indians*, 2025 WL 1178598, at *7–*8 (citing a case involving "nearly five years of formal negotiations with the State" over a tribal-state gaming compact). The Band itself argued when opposing intervention that all of the approval steps for blackjack-type casino games, including the tribal-state compact, would "take at least 18 months." Scotts Valley Opp. Mot. Intervene at 24–25. By the Band's own admission, then, the legal barriers to this type of gaming would not have cleared until *at least* a year after the merits briefing concludes. It is inconceivable that the tribe would be conducting gaming in an as-yet unplanned facility with full legal approval by this fall.

13

So the tribe's sovereignty position changed very little before and after the suspension. There was no "immediate" "legal consequence" with respect to blackjack-style casino games. *Cow Creek Band*, 2025 WL 548316, at *4; *cf. Standing Rock Sioux Tribe v. U.S. Army Corps. of Eng'rs*, 540 F. Supp. 3d 45, 57 (D.D.C. 2021) ("a series of contingent events" precluded a finding of irreparable harm because the harm was not "likely"). "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time." *Wisc. Gas Co.*, 758 F.2d at 674.

There also would be a time delay for the second category of Indian Gaming Regulatory Act games—primarily chance-based games like bingo. Tribes must submit notice to the National Indian Gaming Commission 120 days or, with expedition, 60 days, before offering these games. 25 C.F.R. § 559.2(a) (regulating Class II gaming under IGRA). So, similarly, no bingo or similar games of chance would have been allowed on the land for months regardless of the federal suspension. *Id.* § 559.2(a)(1). This delay would stretch into early fall, when merits briefing will conclude. The harm here, too, is not "imminent." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d at 297.

The tribe responds that the federal gaming suspension has created an affirmative barrier to the tribal-state compact negotiations, and *that* alone is an immediate consequence. Pl. Reply Br. at 30–31. True, California recently stated that it is "unconvinced that the State currently has a duty to negotiate under IGRA." Pl. Ex. G, ECF No. 61-7, at 2. Neither the tribe nor California pointed to a statutory provision that affirmatively prevents the tribal-state compact negotiations from continuing.[5] On the Court's own search, it appears that a federal gaming suspension would

---

[5] Class III gaming is governed by 25 U.S.C. § 2710(d)(1)(A). That provision requires both that no federal prohibition on Class III gaming exist (through incorporating section (b)) and that a tribal-state compact be negotiated. *Id.* Under this provision, the Court takes no position on whether federal approval is a *prerequisite* for

14

merely give the Secretary of the Interior discretion to disapprove a negotiated tribal-state compact. 25 U.S.C. § 2710(d)(8)(A)–(B)(i) ("The Secretary may disapprove a compact . . . only if such compact violates (i) any provision of this chapter . . . ."); *W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1062–63 (D.C. Cir. 2023). In sum, the tribe has not shouldered its burden to show that the tribal-state compact may not continue as a legal matter during the federal suspension. And any factual chilling of negotiations would be reparable; the Department contends that California can just return to the negotiation table if the federal suspension is lifted and the tribe has not pointed to any authority suggesting otherwise. Hr'g Tr. at 40:22–41:13.

**3.**

Finally, any shift in applicable legal regimes also would not cause the kind of factual harm that the D.C. Circuit requires. Irreparable injury must be "actual and not theoretical." *Olu-Cole*, 930 F.3d at 529. The harm must be "tangible," "actual," and "great." *Id.*; *Chaplaincy of Full Gospel Churches*, 454 F.3d at 298–99. The Scotts Valley Band asserts only a theoretical affront to its sovereignty without demonstrating that this harm meets the D.C. Circuit's standard.

At argument, the tribe conceded that it had not even begun building a casino on the Vallejo site and that it had no "actual plans on board" for doing so. Hr'g Tr. at 10:8–13:14. Counsel for the Band briefly suggested that "sprung stretcher[s]" and "modular buildings" would be quicker to raise, perhaps in a "matter of months," but the state of things remains that plans have not even been drafted. *Id.* at 13:1–8. Instead, the tribe effectively concedes that the "irreparable injury here is one that's a matter of law." *Id.* at 11:8–9. The Court sees no authority

---

the tribal-state compact negotiations. *Id.* § 2710(d)(1)(C). The Court also takes no position on the follow-up question whether the tribe could still enforce its statutory right to negotiation as the Department suggests. Gov't Opp. Br. at 9 (citing 25 U.S.C. § 2710(d)(7)(A)(i)).

15

supporting the idea that this type of theoretical irreparable harm qualifies, and the tribe has cited none.

The Band invokes *Mashpee Wampanoag*, which found irreparable harm when the federal government removed tribal land from trust while the agency reconsidered a decision on remand. *Mashpee Wampanoag Tribe v. Bernhardt*, 2020 WL 3034854, at *3 (D.D.C. June 5, 2020). Though the reconsideration posture is on point, the tribal sovereignty infringement is not. Removing land from trust removes the land from Indian sovereignty.  25 U.S.C. § 2703(4) ("The term 'Indian lands' means . . . any lands title to which is [] held in trust by the United States for the benefit of any Indian tribe . . . ."). So trust removal eradicates sovereignty. This context is readily distinguishable from the current situation, where the Department explicitly kept the land in trust for the benefit of the Band pending reconsideration of gaming eligibility. *See* March 27 Decision.[6]

Next, and slightly closer to the mark, is *Ute Indian Tribe of Uintah & Ouray Reservation v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015) (Gorsuch, J.). There, Utah was "prosecuting tribal members in state court for offenses occurring on tribal lands" even after the Tenth Circuit had held that those "very lands" "remain[ed] Indian country." *Id.* at 1004. That opinion drew on a long line of Tenth Circuit cases to hold that the tribe was enduring irreparable injury. *Id.* at 1005. One of those cases was *Wyandotte Nation v. Sebelius*, where Kansas authorities had "stormed the casino" located on a tract of Indian land, "seiz[ing] gambling proceeds and files" and "confiscat[ing] gaming machines." 443 F.3d 1247, 1251–52 (10th Cir. 2006). State police

---

[6] The tribe argues that the two decisions are not severable because the trust acquisition "was expressly premised on the land's suitability for gaming and tribal housing." Pl. Reply Br. at 31. But the gaming purpose for the land was just one of several inquiries the Department made in deciding the land-in-trust designation under 25 C.F.R. Part 151. Compl., Ex. A, ECF 1-1, at 25–31.

also "seized a bank account" that the casino owned. *Id.* at 1252. "In total, the officers seized more than $1.25 million in cash and equipment." *Id.* Kansas also filed criminal charges against the casino's general manager, though they later were dismissed. *Id.* All of this while a case was pending in federal court that would determine whether gaming was properly being conducted on the Indian parcel. *Id.*

The tribes in these cases had endured criminal prosecutions, invasion of their land, and, in one instance, physical property confiscation. Those cases are a far cry from the facts here. The Scotts Valley Band expressly alleges only a theoretical harm to its sovereignty—and it cannot allege more, because no casino or gaming exists to harm. The Band's harm is not "tangible," as the D.C. Circuit requires. *Olu-Cole*, 930 F.3d at 529; *Chaplaincy of Full Gospel Churches*, 454 F.3d at 298–99.

\*\*\*

In sum: Any harm to the tribe's sovereignty is not imminent.[7] Further, that harm is only theoretical, not actual as the irreparable harm standard requires. The Tenth Circuit cases that the tribe relies on do not contradict this high bar.

## IV.

Because the tribe has failed to show irreparable harm, the Court need not evaluate the other three factors. *Olu-Cole*, 930 F.3d at 529 (holding that a failure to show irreparable harm "provides grounds for refusing to issue a preliminary injunction, even if the other three factors

---

[7] The tribe invokes *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016). That case holds that a jurisdictional determination that imposes "civil liability" carries legal consequences that make the agency action final and reviewable. *Id.* at 598–99. But this case only speaks to finality, not irreparable harm. A party theoretically may endure legal consequences sufficient for finality without those consequences wreaking irreparable harm. The Court takes no position at this stage of the litigation on the tribe's finality arguments.

17

entering the calculus merit relief" (cleaned up)).  The Court does, however, intend to move expeditiously to resolve the merits of this dispute to minimize any residual harm the tribe faces.

The Scotts Valley Band's Motion for a Preliminary Injunction is DENIED.

The parties shall submit a joint expedited summary judgment briefing schedule for the Court's consideration.  The briefing schedule should be submitted by June 16, 2025.

**SO ORDERED**.

Dated: June 10, 2025                                    TREVOR N. McFADDEN, U.S.D.J.