### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **SCOTTS VALLEY BAND OF POMO INDIANS**, <br><br> Plaintiff, <br><br> v. <br><br> **DOUGLAS BURGUM, in his official capacity as Secretary of the Interior**, *et al.*, <br><br> Defendants. | Case No. 1:25-cv-00958 (TNM) |

## <u>MEMORANDUM OPINION</u>

This case is about an agency's reversal.  For nearly a decade, the Scotts Valley Band of Pomo Indians has been trying to build a casino in Vallejo, California.  In January, the Department of the Interior granted the Band's request to take a parcel into trust on its behalf and to declare it exempt from federal gaming prohibitions.  Then, almost eleven weeks later, Interior told Scotts Valley that it was temporarily rescinding and reconsidering the parcel's gaming eligibility.  The Department directed the Band not to rely on the previous determination while it reevaluates.

Scotts Valley challenges both the agency's rescission and reconsideration, asserting that each violated the Administrative Procedure Act and the Fifth Amendment's Due Process Clause. The Court addresses the two agency actions separately.  It concludes that the reconsideration is non-final and thus not subject to APA review.  By contrast, the rescission constitutes final agency action.  For the rescission, the Court rules against all three of the Band's APA claims, but it holds in Scotts Valley's favor on the due-process claim.  Summary judgment will be entered accordingly.

# I.

The Scotts Valley Band of Pomo Indians is a federally recognized Indian tribe that "ha[s] lived in Northern California since time immemorial."  Second Am. Compl., ECF No. 92, ¶ 7.  It became landless in the mid-twentieth century after Congress ended its reservation.  *Id.* ¶ 8.

In 2016, the Band asked the Department of the Interior to take a Vallejo parcel into trust on its behalf and declare it eligible for gaming under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 *et seq.*  Second Am. Compl. ¶ 10.  Under that statute, a tribe may conduct gaming activities only on certain "Indian lands."  25 U.S.C. § 2710(b)(1), (d)(1).  These include "all lands within the limits of any Indian reservation" and "any lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe."  *Id.* § 2703(4)(A)–(B).  Meanwhile, IGRA forbids gaming on new lands "acquired by the Secretary in trust for the benefit of an Indian tribe," unless those lands fall into an enumerated exception. *Id.* § 2719(a)–(b).

Scotts Valley brought its gaming application under IGRA's "restored lands" carveout. Second Am. Compl. ¶ 10.  That provision immunizes gaming on "lands . . . taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii).  IGRA does not specify what counts as "restored lands," but Interior has further defined the exception's contours.  Most relevant here, the agency's regulations require the applicant tribe to "demonstrate a significant historical connection to the land."  25 C.F.R. § 292.12(b).

On first review, Interior rejected the Band's application because it had failed to establish enough historical ties to the Vallejo parcel.  Second Am. Compl. ¶ 19.  The Band challenged that decision before another judge of this district.  *See Scotts Valley Band of Pomo Indians v. Dep't of*

*Interior* ("*Scotts Valley I*"), 633 F. Supp. 3d 132, 135 (D.D.C. 2022).  After concluding that

Interior's determination "was inconsistent with the canon of Indian construction" and thus

arbitrary and capricious under § 706 of the Administrative Procedure Act, the court ordered the

agency to reconsider.  *Id.* at 171.  The court otherwise denied the Band's objections to Interior's

determination.  *Id.* at 141–71.

After giving Scotts Valley's application a second look, the agency reversed course.  In

the Biden Administration's waning days, Interior concluded that the Vallejo parcel qualified as

"restored lands" after all.  A.R., ECF No. 113, at SV-2.  In a January 10 letter to the Band, the

agency announced that it would "acquire the Vallejo Site in trust for the Band, and [that] the

Band may conduct gaming on [it] once it [wa]s acquired in trust."  *Id.*  Interior executed the trust

deed the same day.  Second Am. Compl. ¶ 21.  The agency's letter also stated that it had "neither

solicited nor considered any additional evidentiary materials from outside parties" in its post-

remand decision.  A.R. at SV-3–4.

Outside parties soon took issue, and none more forcefully than four neighboring Indian

tribes.  The Yocha Dehe Wintun Nation and Kletsel Dehe Wintun Nation—two Patwin tribes—

claim ancestral ties to the Vallejo parcel, though the federal government ousted them from the

land in the early twentieth century.  *See Scotts Valley Band of Pomo Indians v. Burgum* ("*Scotts

Valley II*"), No. 25-cv-00958, 2025 WL 1178598, at *1 (D.D.C. Apr. 23, 2025).  These tribes

still hold a "cultural easement" over the parcel for their members to visit and preserve cultural

resources, and the Yocha Dehe has, since the 1980s, operated a casino on its own reservation that

draws most of its customers from the San Francisco Bay Area.  *Id.*  The United Auburn Indian

Community lives and operates a casino on its own traditional lands two counties over.  *Id.*  The

Lytton Rancheria is a federally recognized band of Southern Pomo Indians that runs a gaming

facility in nearby San Pablo.  Lytton Rancheria Amicus Br. at 1.  As the neighboring tribes see things, Scotts Valley's casino proposal would siphon their own customer base and harm their economic prospects.  *See, e.g.*, *id.* at 2.  They also dispute the Band's alleged historic ties to the parcel.  *See, e.g.*, Yocha Dehe Amicus Br. at 9–11; Lytton Rancheria Amicus Br. at 9–13.

Shortly after the switch in administrations, representatives for Yocha Dehe contacted Interior officials and sent them a white paper titled "Reconsideration of the Politically Motivated Biden Administration Approval of Scotts Valley 'Restored Lands' in Vallejo, California."  A.R. at SV-55–57, SV-127.  The three-page document contended that "[t]he Scotts Valley Approval should be reconsidered and overturned due to legal error."  *Id.* at SV-55.  Among various shortcomings, the white paper faulted Interior's failure to honor "a binding commitment to consider evidence submitted by local Patwin tribes before making any decision on the Scotts Valley trust application and restored lands request."  *Id.*  To make up for these missteps, the white paper urged Interior to "[n]otify Scotts Valley as soon as possible that the January 10, 2025, decision has been flagged for potential reconsideration."  *Id.* at SV-57.  Time was of the essence because "Scotts Valley should not invest resources in developing the Vallejo Site knowing that the Approval is legally infirm."  *Id.*

Over the next two months, Interior reviewed the neighboring tribes' grievances and had various other contacts with their representatives.  In early February, the Acting Director of the Office of Indian Gaming briefed the Interior official exercising the delegated authority of the Assistant Secretary–Indian Affairs about the tribes' allegations.  *Id.* at SV-62–63.  Staff attorneys in Interior's Solicitor's Office also reviewed the white paper and later briefed the Acting Solicitor on it.  *Id.* at SV-80, SV-82, SV-91.  Yocha Dehe members and attorneys met with Interior in mid-March.  *Id.* at SV-175.  Some days later, a representative for Yocha Dehe reached

out again to an Interior official.  *Id.* at SV-238.  Her email reemphasized the need for swift

action:  "[I]f too much time passes, or if Scotts Valley starts breaking ground (or otherwise relies

on the decision), there's a real risk Interior might not be successful and/or could be tied up in

court."  *Id.*  And, speaking of litigation, the representative also shared that the neighboring tribes

"ha[d] a legal challenge all teed up" if Interior failed to heed their concerns.  *Id.*  The

neighboring tribes made good on that threat days later, filing three lawsuits challenging Interior's

January 10 determination.  *See Yocha Dehe Wintun Nation et al. v. Dep't of Interior et al.*, No.

25-cv-00867, Compl., ECF No. 1 (D.D.C. Mar. 24, 2025); *United Auburn Indian Cmty. v. Dep't

of Interior et al.*, No. 25-cv-00873, Compl., ECF No. 1 (D.D.C. Mar. 24, 2025); *Lytton

Rancheria of Cal. v. Dep't of Interior et al.*, No. 25-cv-01088, Compl., ECF No. 1 (D.D.C. Apr.

10, 2025).  Those cases are pending before this Court.

    In the meantime, Scotts Valley was moving ahead with its casino plans.  In its account,

the Band made "contracts with third parties, including contracts for infrastructure work related to

water and wastewater systems, environmental analysis, and related technical studies."  Pl.'s Mot.

Summ. J., ECF No. 96-1, at 12.[1]  The Band "ha[d] authorized the payment of $1,889,688 in

project related invoices under these contracts and other agreements."  *Id.*  It had also

"commence[d] negotiations" with California's governor "for a class III gaming compact that

would apply to the Vallejo Site," and obtained the National Indian Gaming Commission's

("NIGC") approval for its revised gaming ordinance.  *Id.*

    Days after the neighboring tribes sued, Interior informed Scotts Valley about its changed

course.  In a March 27 letter, Interior told the Band that "the Department [wa]s temporarily

rescinding the Gaming Eligibility Determination for reconsideration," though the Vallejo parcel

---

[1]  This opinion uses CM/ECF pagination except when citing the administrative record.

"remain[ed] in trust." A.R. at SV-669. The agency was acting "pursuant to 43 C.F.R. § 4.5, which provides the Secretary of the Interior . . . with broad authority to review and reconsider any decision of the Department." *Id.* The reason for the reversal: "The Secretary [wa]s concerned that the Department [ha]d not consider[ed] additional evidence submitted after the 2022 Remand." *Id.* "To aid in [its] reconsideration," Interior "invite[d] the Tribe and other interested parties to submit evidence and/or legal analysis regarding whether the Vallejo Site qualifies as restored lands" by May 30, 2025—a deadline later extended to June 13. *Id.*; Mot. Extension of Time, ECF No. 28, at 2–3. The agency also advised that "[d]uring the pendency of this reconsideration, neither the Tribe nor any other entity or person should rely on the Gaming Eligibility Determination." A.R. at SV-669.

Less than a week after receiving Interior's letter, Scotts Valley launched this suit. *See* Compl., ECF No. 1. The Band asserts that Interior's rescission and reconsideration of its gaming eligibility violated § 706 of the Administrative Procedure Act and infringed its Fifth Amendment right to due process.[2] Second Am. Compl. ¶¶ 49–80. The parties have each moved for summary judgment on all counts, and their motions are ripe.[3]

## II.

In the garden-variety dispute, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[2] The Band's due-process claim also travels under APA § 706, Second Am. Compl. ¶¶ 57–63, but the Court addresses it separately from the other APA claims.

[3] The Court acknowledges the helpful amici briefs in this matter. *See* GTL Properties Amicus Br., ECF No. 98; United Auburn Amicus Br., ECF No. 107; Yocha Dehe Amicus Br., ECF No. 108; Cal. Gaming Ass'n Amicus Br., ECF No. 109; Lytton Rancheria Amicus Br., ECF No. 110.

judgment as a matter of law." Fed. R. Civ. P. 56(a). But the standard is different when a court reviews agency action under the APA. In that setting, "the district judge sits as an appellate tribunal," and the "entire case on review is a question of law." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (cleaned up).

APA § 706 requires reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[W]hen an agency exercises discretion granted by a statute, judicial review is typically conducted under the [APA's] deferential arbitrary-and-capricious standard"— under which "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1511 (2025). "The scope of this review is narrow, and reviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567 (2025) (cleaned up).

### III.

The Court must first determine whether the Band is challenging the right kind of action. The APA limits judicial review to "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Although finality is not jurisdictional, "there is no doubt that [plaintiffs] would lack a cause of action under the APA" without it. *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731 (D.C. Cir. 2003). Agency action is final if: (1) It "marks the consummation of the agency's decisionmaking process" and is not "of a merely tentative or interlocutory nature"; and (2) if it is an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v.*

*Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).  The challenged action "must satisfy both prongs of the *Bennett* test to be considered final."  *Sw. Airlines Co. v. U.S. Dep't of Transp.*, 832 F.3d 270, 275 (D.C. Cir. 2016).

Interior's March letter announced two actions that Scotts Valley contests.  First is Interior's reconsideration of the Vallejo parcel's gaming eligibility, for which the agency invited the Band and other interested parties to submit additional briefing about the appropriateness of the January 10 decision.  A.R. at SV-669.  Second, and more immediately, there is Interior's "temporar[y]" rescission of "the Gaming Eligibility Determination."  *Id.*  The Court takes each action in turn.

## A.

The Court can readily dismiss Scotts Valley's complaints about the reconsideration because it remains non-final.  "In assessing whether a particular agency action qualifies as final for purposes of judicial review, [courts] look[ ] to the way in which the agency subsequently treats the challenged action."  *Sw. Airlines*, 832 F.3d at 275.  In this vein, the D.C. Circuit has emphasized that "[o]ngoing agency review renders an agency order non-final and judicial review premature."  *Marcum v. Salazar*, 694 F.3d 123, 128 (D.C. Cir. 2012).

Its decision in *Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017), is instructive. The environmental organizations in that case sued the Environmental Protection Agency over its decision to reconsider a final rule about greenhouse gas emissions and to stay the final rule's implementation in the interim.  *Id.* at 5–6.  The Circuit concluded that reconsideration alone did not meet *Bennett*'s finality standard.  *Id.* at 6.  "By itself," the court reasoned, "EPA's decision to grant reconsideration, which merely begins a process that could culminate in no change to the rule, fails this test."  *Id.*; *see also, e.g.*, *California ex rel. Brown v. EPA*, 940 F.3d 1342, 1351

(D.C. Cir. 2019) (holding non-final an agency's decision to "begin the rulemaking process to potentially alter" previous emission standards for motor vehicles because, "[l]ike granting reconsideration, . . . the process could (at least theoretically) culminate in no change to the current standards"); *MediNatura, Inc. v. FDA*, 998 F.3d 931, 939–40 (D.C. Cir. 2021) ("*MediNatura I*") (declaring agency action non-final because, "[a]fter the addition of a product to the [FDA's] Import Alert, an importer still enjoys an opportunity to convince the agency to change its mind" (cleaned up)).

So too here. Interior's decision to reconsider Scotts Valley's gaming eligibility "merely begins a process that could culminate in no change" to its previous determination. *See Pruitt*, 862 F.3d at 6. The agency's reconsideration is "[o]ngoing," which makes it "non-final and judicial review premature." *See Marcum*, 694 F.3d at 128. All that judicial review would do at this stage is "disrupt the agency's process[]." *See MediNatura I*, 998 F.3d at 939 (cleaned up). Because launching the reconsideration process did not "mark the consummation of the agency's decisionmaking process," *Bennett*, 520 U.S. at 177–78 (cleaned up), the Band "lack[s] a cause of action under the APA" to challenge it, *Reliable Automatic Sprinkler*, 324 F.3d at 731.

The reconsideration's failure on *Bennett* prong one is enough to make it non-final. *See Sw. Airlines*, 832 F.3d at 275. And it fares no better on prong two. "To aid in [its] reconsideration," Interior "invite[d] the Tribe and other interested parties to submit evidence and/or legal analysis regarding whether the Vallejo Site qualifies as restored lands." A.R. at SV-669. Merely allowing Scotts Valley and others to weigh in on the parcel's gaming eligibility does not "determine[]" anyone's "rights or obligations." *See Bennett*, 520 U.S. at 178 (cleaned up); *see also CSX Transp., Inc. v. Surface Transp. Bd.*, 774 F.3d 25, 30 (D.C. Cir. 2014) ("It is firmly established that agency action is not final merely because it has the effect of requiring a

party to participate in an agency proceeding." (cleaned up)).  Particularly so here, where nothing

in Interior's regulations precludes it from soliciting or considering third-party submissions.

*See* 25 C.F.R. §§ 292.1–292.4 (general provisions), §§ 292.7–292.12 (provisions addressing

"restored lands" exception); *see also* Yocha Dehe Amicus Br. at 17 & n.14 (identifying "at least

nine restored lands opinions issued under the Part 292 Regulations" in which Interior "has

expressly acknowledged its consideration of interested-party submissions" (emphasis omitted)).

Nor has reconsideration alone yielded any "legal consequences" because Interior is yet to hand

down its final decision.  *See Bennett*, 520 U.S. at 178 (cleaned up).

The reconsideration does not meet either of *Bennett*'s requirements.  The Court will thus

grant summary judgment against the Band's claims targeting the reconsideration—including that

it violated IGRA and Interior's regulations, Second Am. Compl. ¶ 54, and that it infringed the

Band's due-process rights, *id.* ¶¶ 57–63.

## B.

The rescission is not so nebulous.  As explained below, that decision satisfies both of

*Bennett*'s finality demands.

## 1.

On *Bennett*'s first prong, *Pruitt* is once again a useful guide.  While considering non-final

the EPA's "decision to grant reconsideration," the D.C. Circuit underscored that "[t]he

imposition of the stay . . . [wa]s an entirely different matter."  *Pruitt*, 862 F.3d at 6.  Unlike the

reconsideration, the stay yielded immediate change because it was "tantamount to amending or

revoking [the] rule."  *Id.*  That fact made the stay final under the Circuit's earlier decision in

*International Union, United Mine Workers of America v. Mine Safety & Health Administration*,

823 F.2d 608 (D.C. Cir. 1987).  *Pruitt*, 862 F.3d at 6.  The agency in that case granted "indefinite interim relief from operation of a mandatory safety standard pending a decision on a petition for modification of the safety standard."  *Int'l Union*, 823 F.2d at 610.  The Circuit "ha[d] no difficulty concluding that [this was] a final decision."  *Id.* at 615.  After all, the agency had effectively "granted a modification of the mandatory safety standard for the entire period of time that the petition [wa]s pending," and "[t]here [wa]s no indication that [the agency] intend[ed] to reconsider this decision."  *Id.*

Pruitt* and *International Union* confirm that "an interim agency resolution counts as final agency action despite the potential for a different permanent decision, as long as the interim decision is not itself subject to further consideration by the agency."  *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 78 (D.C. Cir. 2020).  "In that event, the interim resolution is the final word from the agency on what will happen up to the time of any different permanent decision."  *Id.*

The rescission is on all fours with that principle.  Although Interior's letter styled it as "temporar[y]," A.R. at SV-669, the rescission nullified the agency's previous gaming determination.  Because "[t]here is no indication that [Interior] intends to reconsider" the rescission, *see Int'l Union*, 823 F.2d at 615, the agency has given its "final word . . . on what will happen up to the time of any different permanent decision," *see Wheeler*, 955 F.3d at 78.  The rescission thus passes muster under *Bennett* prong one.

**2.**

Now consider prong two, which requires the rescission to have been an action "by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett*, 520 U.S. at 178 (cleaned up).  The Supreme Court has described this inquiry as

"pragmatic." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (cleaned up). *Hawkes*, for example, involved "jurisdictional determinations" ("JDs") under the Clean Water Act, in which the Army Corps of Engineers "specifies whether particular property contains 'waters of the United States'" subject to the Act's strictures. *Id.* at 595 (cleaned up). The plaintiffs sued over a JD finding that their property contained such waters, and the Supreme Court held that the action was final under the APA. *Id.* at 596–97. The Court first took the inverse scenario, concluding that "negative" JDs, which state "that a party's property does *not* contain jurisdictional waters," satisfy *Bennett*'s second prong because they bind the relevant agencies not to bring an enforcement action for five years. *See id.* at 598–99. "It follow[ed] that affirmative JDs have legal consequences as well," chiefly because "[t]hey represent the denial of the safe harbor that negative JDs afford." *Id.* at 599.

*Hawkes* counsels that the rescission is final, but understanding why requires a closer look at IGRA. The statute divides gaming into three classes. Class I consists of "social games solely for prizes of minimal value or traditional forms of Indian gaming." 25 U.S.C. § 2703(6). Class II, meanwhile, includes bingo and certain card games. *Id.* § 2703(7). Class III comprises "all forms of gaming that are not class I gaming or class II gaming," like blackjack and slot machines. *See id.* § 2703(7)–(8). Class I is not regulated by IGRA, but classes II and III are. *See id.* § 2710(a), (d). The regime is strictest for class III gaming, which a tribe may conduct only "in conformance with a Tribal-State compact entered into by the Indian tribe and the State." *Id.* § 2710(d)(1)(C).

States have obligations under IGRA too. If a State receives a request to negotiate a compact from "[a]ny Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted," "the State shall negotiate with the

Indian tribe in good faith to enter into such a compact." *Id.* § 2710(d)(3)(A). Failure to do so eventually leads to the Interior Secretary imposing class III gaming procedures. *See id.* § 2710(d)(7)(B). More broadly, though, IGRA forbids class II and class III gaming on new lands "acquired by the Secretary in trust for the benefit of an Indian tribe," unless a carveout applies. *Id.* § 2719(a). The one relevant here exempts "lands . . . taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition." *Id.* § 2719(b)(B)(iii).

Against this statutory backdrop, it becomes clear why the rescission bore "legal consequences" for the Band. *See Bennett*, 520 U.S. at 178 (cleaned up). In its January letter, Interior declared that the Vallejo parcel "qualifie[d] as restored lands." A.R. at SV-2. Interior resolved to "acquire the Vallejo Site in trust for the Band" and maintained that "the Band may conduct gaming on the Vallejo Site once it is acquired in trust." *Id.* This determination cleared IGRA's barriers to class II gaming, and it entitled the Band to good-faith class III compact negotiations with California.

Meanwhile, although the March letter kept the parcel in trust, it rescinded its gaming eligibility. *Id.* at SV-669. The agency thereby revoked Scotts Valley's prior "safe harbor" from civil liability for class II gaming.[4] *See Hawkes*, 578 U.S. at 599. More, the rescission relieved California of its obligation to negotiate a class III gaming compact with the Band—a point the State itself acknowledged post-rescission. *See* Bergin Decl. Ex. G, ECF No. 61-7, at 2 ("We

---

[4] Interior correctly points out that the rescission does not expose the Band to federal criminal penalties. *See* Defs.' Cross Mot. Summ. J., ECF No. 99-1, at 18–19. After all, the provision authorizing federal criminal prosecution does not apply to "class II gaming regulated by the Indian Gaming Regulatory Act" or "class III gaming conducted under a Tribal-State compact." 18 U.S.C. § 1166(c). But that does not change the fact that *civil* liability attaches. *See* 25 U.S.C. § 2713(a)(1).

remain unconvinced that the State currently has a duty to negotiate under IGRA . . . .").  In this sense, the rescission "severely limits" the Band's ability to achieve a class III gaming compact, which confirms its finality.  *See Sackett v. EPA*, 566 U.S. 120, 126 (2012) (deciding that an EPA order was final in part because it "severely limit[ed] the [plaintiffs'] ability to obtain a permit . . . from the Army Corps of Engineers").

Because the rescission amounted to final agency action, the Court proceeds to the Band's APA claims against it.

## IV.

Scotts Valley asserts that the rescission violated the APA in three ways.  First, the Band urges that the rescission "exceeded [Interior's] authority" to revisit its prior decision.  Pl.'s Mot. Summ. J. at 38–44; Second Am. Compl. ¶¶ 50–52, 66.  Second, it complains that the rescission "was the product of improper political influence."  Pl.'s Mot. Summ. J. at 44–50; Second Am. Compl. ¶¶ 73–80.  Third, the Band faults the agency for "ignor[ing] the significant reliance interests engendered by the January 10 Decision."  Pl.'s Mot. Summ. J. at 50–52; Second Am. Compl. ¶¶ 68–72.  None of these claims succeeds.  The Court examines each in order.

## A.

Begin with the agency's authority.  In its March letter, Interior announced that it was "temporarily rescinding the Gaming Eligibility Determination . . . pursuant to 43 C.F.R. § 4.5, which provides the [Secretary] with broad authority to review and reconsider any decision of the Department."  A.R. at SV-669.  The cited regulation states that "[n]othing in this part shall be construed to deprive the Secretary of any power conferred upon the Secretary by law"—which "includes, but is not limited to: (1) [t]he authority to take jurisdiction at any stage of any case

before any employee or employees of the Department"; and "(2) [t]he authority to review any decision of any employee or employees of the Department."  43 C.F.R. § 4.5(a).[5]

According to the Band, § 4.5 did not authorize the rescission because the action fell into neither bucket.  *See* Pl.'s Mot. Summ. J. at 38–40.  That misses the mark.  Section 4.5 does not pigeonhole the Secretary's authority into its examples, but it instead emphasizes that "[n]othing in this part" strips the Secretary "of *any* power conferred upon [him] by law."  43 C.F.R. § 4.5(a) (emphasis added); *see also* Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 132 (2012) ("The verb *to include* introduces examples, not an exhaustive list."). In other words, § 4.5 recognizes the Secretary's authority to revisit prior decisions, but it neither creates nor constrains it.  Thus, to discern the power's scope, the Court must look beyond § 4.5 and toward the broader legal context.

The D.C. Circuit has repeatedly ruled that "administrative agencies . . . possess at least some inherent authority to revisit their prior decisions."  *Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (Kavanaugh, J.); *accord, e.g.*, *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) ("We have many times held that an agency has the inherent power to reconsider and change a decision if it does so within a reasonable period of time."); *see also Belville Mining Co. v. United States*, 999 F.2d 989, 997 (6th Cir. 1993) ("The Secretary of the Interior has the inherent authority to reconsider an earlier agency decision.").  As the Circuit explained in *Albertson v. FCC*, 182 F.2d 397 (D.C. Cir. 1950), "[t]he power to reconsider is inherent in the power to decide."  *Id.* at 399.

---

[5]  Interior recently revised § 4.5.  *See* 90 Fed. Reg. 2332, 2339 (Jan. 10, 2025) (interim final rule modifying provision); 90 Fed. Reg. 24231, 24231 (June 9, 2025) (delaying effective date of changes until July 21, 2025).  The Court cites the version in effect during the rescission.

But that power has limits.  The first comes from Congress:  Agencies cannot revisit past decisions when a statute forbids it or sets out another correction process.  *See Ivy Sports*, 767 F.3d at 86.  The second comes from timing:  Agencies may deploy their inherent reconsideration power only if they do so "in a timely fashion."  *Id.*  On the first score, the Band points to no statutory limit on Interior's reconsideration authority, and the Court sees none.  The question, then, is timeliness.

The D.C. Circuit's most thorough guidance on timeliness is almost 50 years old:  "What is a short and reasonable time period will vary with each case, but absent unusual circumstances, the time period would be measured in weeks, not years."  *Mazaleski*, 562 F.2d at 720 (cleaned up).  Courts have also looked to non-temporal factors, including: "(1) the complexity of the decision; (2) whether the decision was based on fact or law; (3) whether the agency acted according to its general procedures for review; (4) whether parties had relied upon the initial decision; (5) whether the agency acted in bad faith by advancing a pretextual explanation to justify reconsideration; (6) whether the agency provided notice of its intent to reconsider the initial decision; and (7) the probable impact of an erroneous agency decision absent reconsideration."  Daniel Bress, *Administrative Reconsideration*, 91 Va. L. Rev. 1737, 1761–62 (2005) (cleaned up); *see also Belville*, 999 F.2d at 1001–02 (weighing the same factors in upholding Interior's rescission of a prior grant of mining rights); *Voyageur Outward Bound Sch. v. United States*, 444 F. Supp. 3d 182, 195 (D.D.C. 2020) (same), *vacated as moot*, No. 20-5097, 2022 WL 829754 (D.C. Cir. Mar. 17, 2022).

Taken together, these factors counsel that the rescission was timely.  The March 27 reversal came within "weeks, not years" of the January 10 determination—ten weeks and six days, to be exact.  *See Mazaleski*, 562 F.2d at 720 (cleaned up).  Although not dispositive, this

brief interval leans toward timeliness.  *See, e.g.*, *Bookman v. United States*, 453 F.2d 1263, 1264–66 (Ct. Cl. 1972) (upholding three-month period as timely); *Belville*, 999 F.2d at 1001–02 (eight months).  Particularly so here, where the eleven-week gap spanned a turnover in administrations.  *See Voyageur Outward Bound Sch.*, 444 F. Supp. 3d at 195 (holding reasonable a one-year interval in part because Interior "began reviewing the [prior decision] in the middle of a change of the Administration, when senior-level officials were still being appointed to Interior").

Several non-temporal factors point the same way.  The Vallejo parcel's gaming eligibility is an avowedly complex question.  Not only had Interior already reversed itself once after a federal court remand, *see Scotts Valley I*, 633 F. Supp. 3d at 171, but the agency's January decision was also based on a 30-page analysis, *see* A.R. at SV-1–30.  That Interior had previously reconsidered the same issue also shows that it was acting "according to its general procedures for review," *see* Bress, *supra*, at 1762 (cleaned up), and no statute or regulation suggests otherwise.

More, the agency explained (albeit, curtly) that the rescission arose from its "concern[] that [it] [ha]d not consider[ed] additional evidence submitted after the 2022 Remand."  A.R. at SV-669.  This supposed shortcoming is core to the neighboring tribes' lawsuits against Interior, which claim that the agency's "refusal to consider relevant evidence timely placed before [it] by Yocha Dehe, Kletsel Dehe, and other tribes and concerned parties violated the APA in multiple respects."  *See, e.g.*, *Yocha Dehe Wintun Nation, et al. v. Dep't of Interior et al.*, No. 25-cv-00867, Compl. ¶ 145 (D.D.C. Mar. 24, 2025); *see also* United Auburn Amicus Br. at 17 ("In sum, Interior knew of the concerns that relevant evidence was not reviewed, investigated those concerns, and then cited those concerns as a basis for the reconsideration announced in the

March 27 Letter.").  In this respect, the agency's rescission was "allegedly correcting legal error"—a circumstance in which courts have been more "willing to allow an inherent power to reconsider."  *See* Bress, *supra*, at 1759 (cleaned up); *Belville*, 999 F.2d at 999 (upholding reconsideration where the "legally erroneous" decision, "left uncorrected, would be vulnerable to court challenge").  Nor has Scotts Valley shown that this reason was "pretextual" or that Interior "acted in bad faith," *see* Bress, *supra*, at 1762, as the Court develops below, *see infra* Part IV.B.  Last, any decision on the parcel's gaming eligibility—whether for or against—will have a momentous "impact" on the local community, especially the tribal interests.  *See Belville*, 999 F.2d at 1001–02; *see also* Yocha Dehe Amicus Br. at 5 ("The project poses a significant threat to amici's cultural, governmental, and economic interests.").

To be sure, Interior did not notify Scotts Valley before rescinding its gaming eligibility.  *See* Pl.'s Mot. Summ. J. at 44.  The Band likewise asserts that it had made contracts, authorized payments, and otherwise relied on the January determination.  *See id.* at 42–43.  The Court will duly address the Band's standalone reliance argument, as well as the extent of its reliance interests.  *See infra* Part IV.C.  But even if the Court credits the Band on those two factors, they do not outweigh the others.  *See* Bress, *supra*, at 1765 ("[I]n no case has a federal court used reliance as the sole basis for a determination that the inherent power default presumption does not apply, and courts seem to decide cases on other grounds whenever possible." (cleaned up)).  Because the rescission was timely, it did not exceed Interior's inherent authority.

## B.

Scotts Valley next contends that the rescission "was the product of improper political influence."  Pl.'s Mot. Summ. J. at 44.  According to the Band, the administrative record "shows beyond dispute that the whole process originated with and was driven by lobbyists for Yocha

Dehe." *Id.* at 48. In that account, the rescission's impetus came from Yocha Dehe lobbyists, who contacted Interior in late January and submitted a white paper "propos[ing] that the January 10 Decision be 'reconsidered and overturned due to legal error.'" *Id.* at 46 (quoting A.R. at SV-55). The Band also asserts that the March letter mimicked the two-step process that the white paper outlined: "first, notify Scotts Valley that the decision has been 'flagged for potential reconsideration due to legal error' and, second, 'issue a new decision to correct the legal errors contained in the Scotts Valley Approval.'" *Id.* (quoting A.R. at SV-57); *see also* A.R. at SV-238 (Yocha Dehe representative advocating "a two-step approach, where the first step is a letter informing Scotts Valley of the reconsideration and the second step is the substantive reconsideration process"). In Scotts Valley's eyes, this record "[p]lainly . . . demonstrate[s] improper political influence." Pl.'s Mot. Summ. J. at 49.

The Band must clear a high bar. When courts review "the official acts of public officers," they "presume that they have properly discharged their official duties." *Latif v. Obama*, 677 F.3d 1175, 1178 (D.C. Cir. 2011) (cleaned up). Only "clear evidence to the contrary" will rebut that "presumption of regularity." *Id.* (cleaned up). In a similar vein, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons." *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019).

As an example of these principles in action, take *ATX, Inc. v. Department of Transportation*, 41 F.3d 1522 (D.C. Cir. 1994). The agency in that case denied a company's application to operate a new airline in three airports across the country. *Id.* at 1523. In its petition for review, the company alleged "that members of the United States Congress hostile to [the company's founder] improperly interfered with the proceeding." *Id.* at 1524. That charge had a colorable basis: "The record establishe[d] that members of Congress repeatedly contacted

[Transportation] Secretary Peña to voice their opposition to the ATX application for certification." *Id.* at 1527. The Secretary "received at least 60 letters commenting negatively on [the founder], almost all . . . urging the Secretary to deny ATX's petition outright." *Id.* More, "[o]ne member of Congress testified during the hearing before the ALJ," a fact the Circuit found "particularly troubling." *Id.* But despite its "concern" over congressional meddling, the D.C. Circuit still denied the company's petition. *Id.* at 1524. Because the record "adequately establishe[d] ATX's ineligibility for an airline certificate," the court concluded that "political influence did not enter the decision maker's calculus of consideration." *Id.* at 1530 (cleaned up). On the same note, consider *Belville* once more. There, the Sixth Circuit upheld the agency's reversal on mining rights even though "a Congressional investigation, at least in large measure, was the catalyst for reconsideration." *See* 999 F.2d at 998.

In tandem, *ATX* and *Belville* show that courts seldom second-guess an agency's stated reason for acting unless there is "clear evidence" to rebut it. *See Latif*, 677 F.3d at 1178 (cleaned up). In this setting, courts will do so only if the record shows that "the sole basis for the reversal . . . was that the agency decided to change its official mind" out of pure policy concerns. *See McAllister v. United States*, 3 Ct. Cl. 394, 402 (1983); *see also Voyageur Outward Bound Sch.*, 444 F. Supp. 3d at 196–97 (rejecting argument that reversal following presidential transition was an improper policy change masquerading as error correction); Bress, *supra*, at 1759 (explaining that "federal courts are often reluctant to reject reconsiderations as unlawful policy changes" (cleaned up)).

Scotts Valley does not meet this demanding standard. To be sure, representatives for Yocha Dehe and the other neighboring tribes made repeated efforts to put the rescission on Interior's agenda. Those contacts might even have been "the catalyst for reconsideration." *See*

*Belville*, 999 F.2d at 998.  But that is not enough.  Where Scotts Valley's claim falters is in the substance of Interior's interactions with the neighboring tribes.  On that score, the record suggests that the tribes' objections—at least those conveyed to the agency—were *legal* rather than political.  Most notably, Yocha Dehe's white paper catalogued various "legal errors" that warranted reconsideration.  *See* A.R. at SV-55–56.  Those alleged defects are the crux of the neighboring tribes' lawsuits.  *See, e.g.*, *Yocha Dehe Wintun Nation, et al. v. Dep't of Interior et al.*, No. 25-cv-00867, Compl. ¶¶ 140–97 (D.D.C. Mar. 24, 2025).  Interior referred to these "concern[s]" in its rescission letter, admitting that it had "not consider[ed] additional evidence submitted after the 2022 Remand."  A.R. at SV-669.  Although Interior's explanation could have done more, Scotts Valley has not shown that the rescission was a bare policy change masked by legal justifications.

## C.

The Band's third APA claim is that Interior flouted its reliance interests in an arbitrary and capricious manner.  Pl.'s Mot. Summ. J. at 50–52.  While it presents a close question, the claim ultimately comes up short.

An agency may change its position so long as it "provide[s] a reasoned explanation for the change."  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  That burden is not heavy, "but the agency must at least display awareness that it is changing position and show that there are good reasons for the new policy."  *Id.* (cleaned up).  "In explaining its changed position, an agency must also be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account."  *Id.* at 221–22 (cleaned up).  "It would be arbitrary and capricious to ignore such matters."  *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

The Supreme Court most recently invoked this doctrine in *Regents*.  That case arose from the Department of Homeland Security's rescission of the Deferred Action for Childhood Arrivals ("DACA") program.  *Regents*, 591 U.S. at 9.  As the Court emphasized, "Acting Secretary Duke's justification for the rescission was succinct: 'Taking into consideration' the Fifth Circuit's conclusion that [Deferred Action for Parents of Americans] was unlawful because it conferred benefits in violation of the [Immigration and Nationality Act], and the Attorney General's conclusion that DACA was unlawful for the same reason, she concluded—without elaboration—that the 'DACA program should be terminated.'"  *Id.* at 24 (cleaned up).  In the Court's eyes, that was not enough given the asserted reliance interests.  *Id.* at 30.  For nearly a decade, "DACA recipients ha[d] enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance on the DACA program."  *Id.* at 31 (cleaned up).  The respondents also contended that the rescission's effects "would [have] radiate[d] outward to DACA recipients' families, including their 200,000 U.S.-citizen children, to the schools where DACA recipients study and teach, and to the employers who have invested time and money in training them."  *Id.*  The challengers thus maintained that nixing DACA could have "result[ed] in the loss of $215 billion in economic activity and an associated $60 billion in federal tax revenue over the next ten years."  *Id.*  Because DHS had by its own admission not even "considered potential reliance interests," its action infringed the APA.  *Id.* at 30–31.

*Encino* had similar stakes.  The case involved the Department of Labor's interpretation of a statutory provision exempting certain employees from the Fair Labor Standards Act's overtime pay requirements.  *Encino*, 579 U.S. at 214.  The dispute's focus was Labor's "decision to abandon its decades-old practice of treating service advisors as exempt under" the relevant

provision.  *Id.* at 218.  The automobile and truck industries "had relied since 1978 on the Department's [prior] position."  *Id.* at 222.  Adjusting to Labor's new rule would have "necessitate[d] systemic, significant changes to the dealerships' compensation arrangements," and dealerships that failed to make those changes could have "face[d] substantial FLSA liability."  *Id.* at 222–23.  Despite these "decades of industry reliance," the agency had given "almost no reasons at all" for the shift, which meant that its new interpretation could not "carry the force of law."  *Id.* at 222–24.

This strand of arbitrary-and-capricious doctrine "does not set a high bar."  *See MediNatura, Inc. v. FDA*, 496 F. Supp. 3d 416, 458 (D.D.C. 2020) ("*MediNatura II*"), *aff'd*, 998 F.3d 931 (D.C. Cir. 2021).  Nor is that bar uniformly set across all contexts.  Instead, the agency's "duty" to explain itself "exists in tandem with the nature of the reliance interests at issue."  *Am. Petroleum Inst. v. U.S. Dep't of Interior*, 81 F.4th 1048, 1060 (10th Cir. 2023).  As the D.C. Circuit has explained, "key to understanding *Encino Motorcars* is the Court's recognition that, under the circumstances, a cursory explanation was inadequate 'in particular because of decades of industry reliance on the Department's prior policy.'"  *Kiewit Power Constructors Co. v. Sec'y of Lab.*, 959 F.3d 381, 399 (D.C. Cir. 2020) (quoting *Encino*, 579 U.S. at 222).  Indeed, "[a] summary discussion may suffice in other circumstances."  *Encino*, 579 U.S. at 222.

Courts do not automatically credit all claims of reliance, of course.  The D.C. Circuit has emphasized that "unidentified and unproven reliance interests are not a valid basis on which to undo agency action."  *Solenex LLC v. Bernhardt*, 962 F.3d 520, 529 (D.C. Cir. 2020).  "Instead, the harm occasioned must be specifically identified, reasonably incurred, and causally tied to" the challenged action.  *Id.*  Accordingly, *Solenex* vacated summary judgment because the district

court had "relied on a generalized reference to 'reliance interests' to conclude that the [lease] cancellation decision was arbitrary and capricious." *Id.* (cleaned up); *see also Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 722 (D.C. Cir. 2016) (rejecting the idea "that merely mentioning the 'millions of dollars' allegedly spent in reliance upon a permit is sufficient to preserve an argument that the EPA must weigh those reliance costs against environmental harms").

By those lights, Scotts Valley's reliance interests do not render the rescission arbitrary or capricious. It is true, the Band surely had incurred *some* reliance on the January determination. The Band asserts that it had made "contracts with third parties . . . for infrastructure work related to water and wastewater systems, environmental analysis, and technical studies." Pl.'s Mot. Summ. J. at 51. The Band also claims to have "authorized the payment of millions of dollars in project related expenses," "signed an agreement to reimburse the City of Vallejo's costs to evaluate and analyze potential impacts of the Tribe's development," and "amended its gaming ordinance and obtained NIGC approval." *Id.*

But the Band's description of its reliance remains at a high level, and its declarations do not offer more detail. *See id.*; First Davis Decl., ECF No. 3-2, ¶¶ 12–17; Second Davis Decl., ECF No. 63-2, ¶¶ 11–13. That lack of specificity makes it difficult to determine which actions postdated Interior's January 10 determination. For example, the record does not make clear which payments Scotts Valley made under contracts executed after that date. *See* First Davis Decl. ¶ 13 (stating that "the Tribe has authorized the payment of $1,889,688 in project-related invoices pursuant to [post-January 10] contracts *and other agreements*" (emphasis added)). And the only contract described in more detail—the purchase agreement with GTL Properties—was entered November 2, 2024, more than two months too early for any legitimate reliance. *See* GTL Properties Amicus Br. at 9. In short, the Band's reliance claims ring hollow.

Even if the Court credited the Band's reliance interests, they still differ from those in *Encino* and *Regents*. Those cases involved society- and industry-wide reliance on longstanding policies; here, Scotts Valley relied on a parcel-specific determination that was eleven weeks old. And the Band did so knowing that legal challenges would likely soon follow. *See Yocha Dehe v. U.S. Dep't of the Interior*, 3 F.4th 427, 428 (D.C. Cir. 2021) (Yocha Dehe moving to intervene as defendant in Band's suit against Interior over 2019 denial of "restored lands" exception). The Band's reliance thus is "tempered by substantial concerns for legal or political jeopardy." *See Mozilla Corp. v. FCC*, 940 F.3d 1, 64 (D.C. Cir. 2019).

It is also true that Interior's March letter was terse. The agency justified its action chiefly with the "concern[] that the Department did not consider additional evidence submitted after the 2022 Remand." A.R. at SV-669. It acknowledged Scotts Valley's reliance only in directing it not to "rely on the Gaming Eligibility Determination" while reconsideration was ongoing. *Id.* The Yocha Dehe white paper that multiple Interior officials reviewed contained a somewhat longer discussion of reliance interests and why the January determination's legal errors outweighed them. *See id.* at SV-55–57. So the record shows that Interior was "cognizant" of the Band's reliance, though it addressed it only curtly. *See Regents*, 591 U.S. at 30 (cleaned up).

In the end, Scotts Valley has provided no precedent in which a court held similar agency action arbitrary and capricious. Nor is the Court aware of any. To the contrary, the D.C. Circuit has greenlit agency reversal even where the reliance was great and the agency explanation curt. *See MediNatura I*, 998 F.3d at 942–43 (upholding FDA's withdrawal of 30-year enforcement guidance on homeopathic drugs where the agency gave a one-paragraph explanation). Scotts Valley's theory would break new ground, and the caselaw does not warrant that move.

* * *

Scotts Valley falls short on its three APA claims.  The Court turns to due process next.

## V.

The Band finally urges that the rescission infringed its right to due process.  Pl.'s Mot. Summ. J. at 28–35.  Here, the Court agrees.  It holds that the Band's gaming eligibility was a protected property interest and that Interior provided too little process to rescind it.

### A.

The Fifth Amendment's Due Process Clause guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property.'"  *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010).  "Only after finding the deprivation of a protected interest do [courts] look to see if the government's procedures comport with due process."  *Id.* (cleaned up).  To determine whether a protected interest exists, courts "look not to the weight but to the nature of the interest at stake."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570–71 (1972) (cleaned up).

To enjoy a due-process interest in a government benefit, a plaintiff must have "a legitimate claim of entitlement," not a mere "unilateral expectation."  *Id.* at 577.  "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005).  The D.C. Circuit has likewise ruled that if the government retains "unfettered discretion" to withhold a benefit "even upon satisfaction of all eligibility criteria," "no constitutionally protected property interest exists." *N.B. ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015).  Due process

applies only if the "statute or implementing regulations place substantive limits on official discretion." *Id.* at 41–42.

Here too, timing matters.  In deciding whether a benefit counts as a property interest, courts differentiate between "applicant[s]" and "holder[s]."  *See 3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1072 (D.C. Cir. 2003) (emphases omitted).  That "critical distinction" applies to licenses and "permit[s]."  *See id.*  "While a person does not have a protected interest in a possible future business license, the situation changes once the license is obtained."  *Spinelli v. City of New York*, 579 F.3d 160, 169 (2d Cir. 2009) (cleaned up).  At that stage, the question is no longer whether the government "had broad discretion over whether to grant or deny [the] license" in the first place.  *Id.* (cleaned up).  The inquiry instead comes to "focus[] on the official's discretion to *revoke* or *suspend* the permit."  *3883 Connecticut LLC*, 336 F.3d at 1072 (emphases added).

Courts have consistently recognized that license holders have a due-process interest when officials' discretion to revoke is constrained.  In *Barry v. Barchi*, 443 U.S. 55 (1979), the Supreme Court confronted a due-process claim over the suspension of a horse trainer's license. *Id.* at 61.  Under New York law, officials could suspend the trainer's license "only upon a satisfactory showing that his horse had been drugged and that he was at least negligent in failing to prevent the drugging."  *Id.* at 64.  Given these guardrails on official discretion, the Court held that the trainer had "a clear expectation of continued enjoyment of [his] license absent proof of culpable conduct."  *Id.* at 64 n.11.  That, in turn, meant he "had a property interest in his license sufficient to invoke the protection of the Due Process Clause."  *Id.* at 64 (cleaned up).

So too in *3883 Connecticut LLC*, where the D.C. Circuit endorsed a company's property interest in building permits where "[r]evocation [wa]s limited to the five circumstances listed" in

the D.C. construction codes.  336 F.3d at 1073.  As the Circuit saw things, the city's authority to

rescind the permits was "not unfettered . . . but instead [wa]s constrained sufficiently to give [the

company] an expectation in the continued effect of the permits."  *Id.*  To that same tune, the

Second Circuit in *Spinelli* concluded that a gun dealer had a property interest in her license

because New York regulations empowered the city to revoke it only "under specific

circumstances."  579 F.3d at 169.

 There is no property interest, by contrast, in licenses or other benefits that officials may

revoke at will.  The Supreme Court's decision in *Bishop v. Wood*, 426 U.S. 341 (1976), offers an

example.  There, the Court rejected a claimed property interest in continued employment

because, under state law, the plaintiff "held his position at the will and pleasure of the city."  *Id.*

at 345–47 (cleaned up); *see also Roth*, 408 U.S. at 578 (finding no property interest where there

was no "state statute or University rule or policy that secured [the plaintiff's] interest in re-

employment or that created any legitimate claim to it" (cleaned up)).

 The D.C. Circuit has applied the same principle.  In *Lopez v. FAA*, 318 F.3d 242 (D.C.

Cir. 2003), the court denied a plaintiff's asserted property interest in his status as a "Designated

Engineering Representative" because that status was rescindable wholly "at the FAA's

discretion."  *Id.* at 248–49.  Likewise, in *Fried v. Hinson*, 78 F.3d 688 (D.C. Cir. 1996), the

Circuit held that the plaintiff had no property interest in his certification as a "Designated Pilot

Examiner" because "[t]he Federal Aviation Act and relevant regulations explicitly permit[ted]

the agency to not renew an examiner for any reason."  *Id.* at 692.

 The Gaming Eligibility Determination straddles the line between both sets of cases, but it

falls closer to those endorsing a property interest.  Interior's January decision functioned much

like a license or permit.  Once the agency took the parcel into trust and deemed it eligible for

28

gaming, no further legal barrier stood in the way of class II gaming.[6]  *See supra* Part III.B.  At that point, Scotts Valley held a property interest in gaming eligibility so long as the agency's discretion to rescind it was "constrained sufficiently to give [the Band] an expectation in [its] continued effect."  *See 3883 Connecticut LLC*, 336 F.3d at 1073.  The Band's legal relationship with California also changed in an important way.  *See* 25 U.S.C. § 2710(d)(3)(A) ("the State shall negotiate with the Indian tribe in good faith to enter into such a compact.").  This all suggests the Band obtained a valid property interest through the January 10 decision.

No statute expressly limits Interior's discretion, to be sure.  But neither has Congress authorized the agency to rescind gaming eligibility at will.  *Cf. Bishop*, 426 U.S. at 345–47.  In the absence of clear statutory guidance, the doctrine of inherent authority fills the gap, but that doctrine is no blank check.  It carries real constraints, most notably timeliness.  *See supra* Part IV.A.  Those limits were enough, in the Court's judgment, to give Scotts Valley a "legitimate claim of entitlement" to gaming eligibility once granted.  *See Roth*, 408 U.S. at 577.  Interior may have had the power to rescind, but it had to do so consistent with due process.

**B.**

Once its protections kick in, the Due Process Clause demands "notice and [an] opportunity for [a] hearing appropriate to the nature of the case."  *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)).  Courts determine what process is due by balancing three factors: (1) the private interest affected by the government's decision; (2) the probable value of additional

---

[6]  Interior responds that "NIGC regulations require tribes to notify the Chair at least 120 days before opening any new facility, place or location on Indian lands where class II or III gaming will occur."  Ds.' Reply, ECF No. 112, at 15 n.1 (citing 25 C.F.R. § 559.2).  But that procedural notice requirement does not undermine the Band's legal right to game.

procedural safeguards; and (3) the government's interest in the decision and the existing procedure. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

The interests are weighty on both sides. According to Scotts Valley, gaming on the Vallejo parcel would rejuvenate the long landless tribe's "governmental operations and economic development." Pl.'s Mot. Summ. J. at 35. The business plan the Band submitted to Interior estimated that, once ramped up, gaming operations would generate $243.5 million per year. *Id.* at 32 (citing A.R. at SV-29 n. 262).[7] More, because Interior regulations require a tribe to submit "restored lands" applications within 25 years of the tribe's restoration, this is the Band's last chance. *See* Pl.'s Reply, ECF No. 111, at 36 n.20 (citing 25 C.F.R. § 292.12(c)(2)). While Interior offers little explanation, it presumably has an interest in reaching the right gaming decision because a Vallejo casino would have substantial social and economic effects, especially on the neighboring tribes. Given these dueling interests, the Court assesses the adequacy of Interior's procedures by comparing them to the standards established in the relevant caselaw.

The Court can quickly sum up Interior's process. By its own admission, Interior gave the Band no warning before rescinding its gaming eligibility. *See* Defs.' Cross Mot. Summ. J. at 27. While leaving Scotts Valley in the dark, the agency communicated several times and even met with the neighboring tribes before the March rescission. *See supra* Part I. Once it informed the Band, Interior explained simply that "the Secretary [wa]s concerned that the Department did not consider additional evidence submitted after the 2022 Remand." A.R. at SV-669. To weigh in on future gaming eligibility, Interior "invite[d] the Tribe and other interested parties to submit evidence and/or legal analysis regarding whether the Vallejo Site qualifies as restored lands

---

[7] The Band's due-process interests extend beyond its narrower reliance interests, which pertain only to the period from January 10 to March 27. *See supra* Part IV.C.

under 25 U.S.C. § 2719(b)(l)(B)(iii) and 25 C.F.R. Part 292." *Id.*  The deadline was June 13.

Mot. Extension of Time at 3.[8]

**1.**

It takes little *Mathews* balancing to see that Interior provided insufficient notice.  Due

process demands "notice reasonably calculated, under all the circumstances, to apprise interested

parties of the pendency of the action and afford them an opportunity to present their objections."

*Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 599 (D.C. Cir. 1993) (cleaned up),

*as amended on denial of reh'g* (Mar. 26, 1993).  "Obviously, when a notice requires its target to

guess among several possible bases for adverse government action, it has not served those

fundamental purposes." *Id.*  "Without notice of the specific reasons for denial, a claimant is

reduced to guessing what evidence can or should be submitted in response and driven to

responding to every possible argument against denial at the risk of missing the critical one

altogether." *Gray Panthers v. Schweiker*, 652 F.2d 146, 168–69 (D.C. Cir. 1980).

Applying this principle, *Gray Panthers* held that a notice denying Medicare benefits was

constitutionally deficient because it failed to specify which of two possible reasons motivated the

denial.  *See id.* at 167–69.  Similarly, in *Spinelli*, the Second Circuit held that a city gave

"constitutionally inadequate" notice when it suspended a gun dealer's license.  579 F.3d at 172.

"The cursory letters sent to Spinelli," the court observed, "only informed her of the license

suspension and the status of the investigation." *Id.*  "Beyond the conclusory statement that

security at [her gun shop] was inadequate, there was no specificity to the actual infractions." *Id.*

---

[8]  To boot, Interior hardly defends its process on summary judgment.  *See* Defs.' Mot. Summ. J. at 27 ("Finally, the Department provided Scotts Valley with the process it is due.  It notified Scotts Valley of the temporary rescission, provided the opportunity to submit additional evidence, and will issue a new decision at the end of the reconsideration process.").

Because Spinelli "was left to guess at the security breaches to which the letters referred," the notice "plainly failed to 'reasonably . . . convey the required information' that would [have] permit[ted] her to 'present [her] objections' to the City." *Id.* (quoting *Mullane*, 339 U.S. at 314).

So too here. The Band learned of the rescission only once it was a fait accompli. Interior's sole stated reason was its "concern[] that [it] did not consider" post-remand evidence. A.R. at SV-669. The Band "was left to guess" why the Vallejo parcel no longer satisfied IGRA's "restored lands" exception. *See Spinelli*, 579 F.3d at 172. Without more specific reasons, Scotts Valley was "driven to responding to every possible argument against" its gaming eligibility. *See Gray Panthers*, 652 F.2d at 168–69. For these reasons, the Court concludes that Interior's notice flouted due process.

## 2.

Nor did Interior afford Scotts Valley much of a hearing. The agency merely "invite[d] the Tribe and other interested parties to submit evidence and/or legal analysis regarding whether the Vallejo Site qualifies as restored lands." A.R. at SV-669. The Band has received no formal hearing or opportunity to respond to adverse evidence—including the arguments the neighboring tribes raised with the agency even before the rescission. Paired with Interior's defective notice, this is not enough.

That is not to say that due process necessarily required a pre-rescission hearing. Courts confronting comparable circumstances have rejected that premise. In *Connecticut 3883 LLC*, for example, the D.C. Circuit declined the plaintiff's claim for a hearing before "issuance of a stop work order [] that halted [the company's] construction of a 168–unit apartment building." 336 F.3d at 1069, 1074. Although the plaintiff "ha[d] a substantial interest in the continued effect of the permit and in proceeding with [the] project without delay," the court heeded the

government's "interest in maintaining its capability to act swiftly to bring an immediate halt to construction work that poses a threat to public health and safety or to the environment." *Id.* at 1074. *Spinelli* similarly ruled that the gun dealer was not entitled to a pre-suspension hearing due to the government's interest in "ensuring the security of gun shops." 579 F.3d at 170. Both results align with *Barry*, where the Supreme Court found post-deprivation process sufficient to revoke the horse trainer's license. 443 U.S. at 63–64. Although the trainer had a "substantial" interest "in avoiding suspension," the Court emphasized the State's "interest in assuring the integrity of the racing carried on under its auspices." *Id.* at 64. "In these circumstances," the Court concluded, "the State is entitled to impose an interim suspension, pending a prompt judicial or administrative hearing that would definitely determine the issues." *Id.*

But *Barry* also underscores why Interior's process is wanting, in any event. The agency never gave the Band the "prompt judicial or administrative hearing" that due process demands. *See id*. No offer for such a hearing was ever made, leaving Scotts Valley unable to rebut the arguments that the neighboring tribes had presented in their multiple pre-rescission contacts with Interior. *See Ralls Corp. v. CFIUS*, 758 F.3d 296, 319 (D.C. Cir. 2014) ("[D]ue process requires, at the least, that an affected party be informed of the official action, be given access to the . . . evidence on which the official actor relied and be afforded an opportunity to rebut that evidence."). This case therefore stands apart from those upholding post-deprivation procedures. In *3883 Connecticut LLC*, the D.C. Circuit approved the stop work order only because "regulations provide[d] for expedited post-deprivation review before two District officials and then immediate appeal to the District Board of Appeals and Review." 336 F.3d at 1074. The Band enjoyed no such opportunity. Instead, this case tracks *Spinelli*, where the Second Circuit found due process lacking not only because of defective notice but also because "[t]he

administrative hearing process was not available to Spinelli during the City's pending investigation." 579 F.3d at 172–73.

*  *  *

In short, the rescission violated due process. Once Interior took the Vallejo parcel into trust and determined that it was eligible for gaming, Scotts Valley acquired a legitimate property interest in that determination. Because the agency rescinded the parcel's gaming eligibility with barely any notice or hearing, it infringed the Band's due-process right.

<h2 style="text-align:center">VI.</h2>

Finally, a word on the remedy. Given the rescission's constitutional defects, the Court will vacate it. *See* 5 U.S.C. § 706(2)(B) (directing courts to "set aside" agency action that is "contrary to constitutional right"). Interior has proffered no good reason why remand without vacatur would be appropriate. *See* Defs.' Cross Mot. Summ. J. at 42–43. To be clear, the Court's remedy does not bar Interior from continuing its reconsideration, nor does it stop the Department from revoking the Band's gaming eligibility at the end of that process. For that reason, Scotts Valley would be ill-served by placing undue reliance on today's decision. But Interior, too, must take seriously the Band's reliance interests, and it must provide the required due process. The Court recognizes that this dispute is likely far from over, and it decides only the snapshot properly before it.

Summing up: The reconsideration remains non-final, so the Court will grant summary judgment against the Band's challenges to it. As for the rescission, the Court will enter summary

judgment against the Band's claims that it violated the APA.  But it will grant summary

judgment in Scotts Valley's favor on the due-process claim.  A separate Order will issue today.


Dated: October 30, 2025               _____

                                               TREVOR N. McFADDEN
                                               United States District Judge